**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 18, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

JOHN D. FOGARTY,

      Plaintiff-Appellee,

v.

GILBERT GALLEGOS; CITY OF
ALBUQUERQUE,

      Defendants,

and

JOHN GONZALES; DONALD
KEITH; MICHAEL FISHER;
STEVEN HILL; NICK
GONZALES; DAVE HUBBARD,
in their individual capacities,

      Defendants-Appellants.

Nos. 06-2238 & 06-2279

---

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. CIV-05-26 WJ/LFG)**

---

Jerry A. Walz, Walz and Associates, Cedar Crest, New Mexico, for Defendants-Appellants.

Luis Robles, Robles, Rael & Anaya, P.C., Albuquerque, New Mexico for Defendants-Appellants.

Paul J. Kennedy (Mary Y.C. Han, with him on the briefs), Kennedy & Han, P.C., Albuquerque, New Mexico for Plaintiff-Appellee.

---

Before **LUCERO**, **EBEL**, and **HOLMES**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

---

Plaintiff-Appellee John D. Fogarty brought this action against six Albuquerque Police Department ("APD") officers and supervisors ("defendants"),[1] alleging constitutional violations under 42 U.S.C. § 1983 as well as state law tort claims. On appeal, defendants assert that they are entitled to qualified immunity from the § 1983 claims and summary judgment on certain of Fogarty's state law tort claims. Exercising limited jurisdiction over this interlocutory appeal pursuant to Mitchell v. Forsyth, 472 U.S. 511 (1985), we affirm the district court's denial of summary judgment to John Gonzales, Nick Gonzales, Steven Hill, and Dave Hubbard, reverse the denial of summary

---

[1] Defendants are John Gonzales, Donald Keith, Michael Fisher, Steven Hill, Nick Gonzales, and Dave Hubbard.

judgment to Donald Keith, and dismiss defendants' state-law appeals for lack of jurisdiction.

**I**

**A**

Fogarty's claims arise from his March 20, 2003, arrest by APD officers during an antiwar protest and march. Although the protest was chronicled on videotape, the parties vigorously dispute significant details surrounding the actions of the APD, Fogarty, and other protesters. We thus set forth a general description of events here, but discuss the district court's factual findings as we address defendants' specific contentions.

In the days leading up to the March 2003 invasion of Iraq, the area of downtown Albuquerque near the University of New Mexico ("UNM") campus became home to several antiwar protests. Protest leaders planned a demonstration for March 20, 2003, the day after the United States invaded Iraq, and met beforehand with the APD to discuss logistics. The protest was to take place in part on UNM property, where protests were allowed on its campus without restriction under the university's policy, but also on the city streets, where defendants claim that city and state law requires permits for large gatherings or marches. Although the protesters had not obtained a permit, APD coordinated with protest leaders and planned to close one lane of the street adjacent to the

UNM bookstore, where the organizers planned to gather, if necessary. The exact nature and extent of APD's acquiescence to the protest is disputed by the parties.

Around 5:00 p.m. that evening, a crowd gathered on the UNM campus to express opposition to the war. Defendant Captain John Gonzales supervised the APD response, consisting of up to 75 officers and including SWAT teams, equine units, canine units, traffic officers, and a bomb squad. Later, John Gonzales also mobilized Emergency Response Teams ("ERTs"). Members of SWAT and ERT wore face-concealing gas masks, and ERT uniforms did not have any identifying marks such as the officers' names or badge numbers.[2] Fogarty alleges that officers wearing standard uniforms concealed their badge numbers with tape.

At the protest's peak, between 500 and 1000 individuals were present, spilling over onto Albuquerque city sidewalks fronting UNM and eventually filling the crosswalks of adjacent streets. According to APD, the protesters' occupation of the crosswalks effectively blocked all traffic on Central Avenue, the street running past the bookstore. To ensure the crowd's safety, APD closed the street just east of the bookstore. After the street was closed, the crowd

---

[2] Officers' uniforms lacked identifying marks due to an APD policy in effect at the time of the protest. According to the defendants, the policy was designed to prevent protestors from using name tags to direct personalized insults at an officer, which might provoke the officer to respond inappropriately out of anger. APD officials deny that the policy was intended to avoid complaints or lawsuits against individual officers. As a result of an investigation into APD's response to the March 20 protest, the department now requires identifying information on ERT uniforms.

flooded into the rest of the street. The protesters then began moving west on Central Avenue. Eventually, they encountered a police skirmish line blocking the avenue, at which point they turned around and began walking east, back toward the bookstore.

As the crowd reversed direction, roughly an hour after the protesters first gathered, John Fogarty arrived at the bookstore to join the group. Fogarty, a physician and faculty member at UNM, was accompanied by his wife, a friend, and his friend's fiancee. Fogarty observed that several streets had been closed and assumed that police were permitting demonstrators to march in the streets. Fogarty then joined the main group of marchers, which by now was four blocks away, heading back east toward the bookstore. According to Fogarty, the mood of the group at this time was "very peaceful," a characterization which defendants vehemently contest. Fogarty noticed that some protestors had formed a drum circle, and that several people were dancing and singing.

When the march reached the bookstore, Fogarty and his friend went back to his friend's car to collect their drums. After retrieving the instruments, Fogarty and his friend joined a drum circle of approximately ten protesters in the westbound lane of Central Avenue, in front of the bookstore. According to APD officers, the drummers were inciting the crowd and making it difficult to communicate, whereas Fogarty claims that they were "play[ing] a really nice samba" without being excessively loud; he played the drum with his hands,

although many others used sticks. Fogarty stated that his drumming was his "personal way of expressing something through music," in this case, his opposition to the Iraq war. He remained with the other drummers for approximately 20 minutes, drumming intermittently during that time.

While the crowd was gathered around the bookstore, police made announcements over the loudspeaker system ordering protesters to either disperse or return to UNM property. Fogarty testified that he could not understand these "garbled and unintelligible" warnings, and it is undisputed that APD never ordered the drummers to stop playing. Evidence presented to the district court indicated that this communication problem may have been due to the noise of the drumming, a malfunctioning speaker system, or the failure of some police sirens to shut down prior to the announcement.

APD officers followed the warnings by deploying tear gas. After the first volley of gas, Fogarty moved onto the steps of the UNM bookstore because he "was there for a peaceful demonstration" and wanted to avoid the tear gas. According to Fogarty, this was the first time he understood that APD wanted the protesters out of the streets. Police then repeated the order to clear the streets and move on to UNM property, which Fogarty reported hearing. Most people complied, but a handful of demonstrators remained in the streets.

At some point during these events, John Gonzales ordered APD forces to "remove the drums."[3] Gonzales claims that this order meant that officers should first try to stop the drumming and then arrest the drummers only if necessary, but subordinate officers testified that they understood the statement as a direct order to arrest the drummers. In response to Gonzales' order, police teams moved in and arrested some of the drummers who remained in the street, but not Fogarty, who had already left the street.

While he was standing on the UNM campus, Fogarty alleges that an APD officer shot him with some sort of projectile, perhaps a "pepper ball" or some other variety of "less lethal munition."[4] The police also deployed a second volley of tear gas, but from his location on the bookstore steps, Fogarty was only minimally affected by the gas.

Four to five APD officers then approached Fogarty as he knelt on the steps. Fogarty does not remember if he was drumming at the time. The officers, whom Fogarty cannot positively identify, picked him up and began leading him down

---

[3] The precise sequence of these events is unclear. Gonzales stated that the drummers were removed prior to the use of any tear gas, but Fogarty maintains, and a videotape suggests, that he was arrested after tear gas had been deployed.

[4] The police deployed a number of different species of "less lethal" munitions during the protest. Of primary relevance here are: (1) "pepper balls," rifle-fired projectiles that break into pieces on impact and release oleoresin capsicum powder (commonly known as mace), thereby causing both pain at the point of impact and irritation of the targeted individual's eyes and breathing passages; (2) canisters of CS, an aerosolized irritant commonly known as tear gas; and (3) "silver candles," canisters which release smoke.

the steps. Fogarty had difficulty walking because the drum was attached to his belt. As officers took him toward the street and closer to the tear gas, Fogarty, who has asthma, suffered an "acute broncospasm" that rendered him unable to walk further. Officers then forced Fogarty to the ground, pulling his arms behind his back and forcing the palm of his hand toward his forearm in a "hyperflexion position." They handcuffed him, ripped the drum off his belt, and dragged him down the street. Eventually realizing that Fogarty was having an asthma attack, officers stopped to allow him to catch his breath.

Fogarty was then taken into custody in a police van and later transported by ambulance to a hospital. APD released Fogarty without charging him with any crime. Despite clear instructions that each officer was to fill out an arrest report, no report was filed on Fogarty's arrest. As a result of his encounter with the APD officers, Fogarty suffered a torn tendon in his wrist and was treated at the hospital for asthma.

Defendants' individual roles in Fogarty's arrest are the subject of a spirited factual dispute. Fogarty was never able to identify the officers who arrested him, in part because ERT uniforms lacked name tags or badge numbers and no one completed an arrest report for Fogarty.[5] Fogarty, however, makes several allegations linking defendants to his arrest.

---

[5] The district court was "perplex[ed]" that, despite the existence of a videotape documenting the arrest, 27 volumes of discovery, and 30 depositions, no witness could positively identify the arresting officers.

John Gonzales commanded the group of officers who responded to the protest and ordered the drummers removed. Fogarty also stated that he saw an officer, whom the district court concluded might have been John Gonzales, witnessing his arrest, but the record on this point is not clear.

Sergeant Steven Hill led a SWAT team, which included Nick Gonzales and Dave Hubbard. In response to the order to remove the drummers, he and his team began arresting people around the area of the bookstore. Although Hill stated that he witnessed Fogarty's arrest, he could not say with certainty which officers actually seized Fogarty. Both Nick Gonzales and Hubbard deny arresting Fogarty.

Sergeant Donald Keith supervised a group of ERT officers during the protest, but states that he only arrested a single drummer who was not Fogarty. Keith testified that he and his team were on Central Avenue, not on UNM property.

Officer Michael Fisher was a member of Keith's team, and he formed part of the skirmish line that moved protesters eastward toward the bookstore. Fisher stood behind the first line of police officers and was equipped with a pepper-ball gun. He admits to firing at one protester who was in the middle of Central Avenue, but denies shooting Fogarty on the UNM bookstore steps.

**B**

Fogarty brought suit in the United States District Court for the District of New Mexico, alleging federal constitutional and state law tort claims against individual APD officers, APD's chief of police, and the City of Albuquerque.[6] His second amended complaint contains five counts relevant to this appeal. Of these, three are civil rights claims brought under 42 U.S.C. § 1983: unlawful arrest in violation of the Fourth and Fourteenth Amendments, excessive use of force in violation of the Fourth and Fourteenth Amendments, and supervisory liability for these alleged constitutional violations. The remaining two counts concern intentional state torts of assault, battery, and false arrest, as well as unintentional torts under theories of negligence, gross negligence, and recklessness.

After filing his first complaint, Fogarty conducted extensive discovery, including depositions of a substantial number of officers who responded to the protest. By Fogarty's own admission, these discovery efforts proved fruitless in ascertaining the identity of the remaining officers who participated in his arrest.

Following discovery, defendants moved for summary judgment. The court granted summary judgment to (1) John Gonzales on Fogarty's assault and battery claim, (2) Keith on all of Fogarty's claims except for § 1983 supervisory liability,

---

[6] The present consolidated appeal encompasses only the claims against the individual officers and supervisors, and does not include claims against Gilbert Gallegos, who was APD Chief of Police at the time of the incident, or the City of Albuquerque.

and (3) Fisher on all claims except assault and battery.  All remaining summary judgment motions were denied, including defendants' motions for summary judgment based on qualified immunity.  Defendants now appeal the district court's adverse rulings.

## II

## A

Before turning to the merits of this appeal, we must first address the extent of our jurisdiction over the issues presented.  Although orders denying summary judgment are ordinarily not appealable, we have interlocutory jurisdiction over denials of qualified immunity at the summary judgment stage to the extent that they "turn[] on an issue of law."  Mitchell, 472 U.S. at 530.  Under this limited jurisdiction, we may review the district court's abstract legal conclusions, such as whether the law was clearly established at the time of the alleged infraction.  See Behrens v. Pelletier, 516 U.S. 299, 313 (1996).  At this stage, however, we are not at liberty to review a district court's factual conclusions, such as the existence of a genuine issue of material fact for a jury to decide, or that a plaintiff's evidence is sufficient to support a particular factual inference.[7]  See Johnson, 515

---

[7] Defendants contend that we also have jurisdiction to review whether the disputed issues of fact found by the district court are "material," asserting that our precedents conflict on this issue.  We see no inconsistencies in our prior case law. We would have jurisdiction to reverse if the only factual disputes identified by the district court were legally irrelevant to the issue of qualified immunity, as we did in Blossom v. Yarbrough, 429 F.3d 963, 967-68 (10th Cir. 2005).  In this

(continued...)

- 11 -

U.S. at 316; Walker, 451 F.3d at 1155 ("We lack jurisdiction over these challenges to the district court's findings to the extent they challenge the existence of disputed facts for summary judgment purposes."); Garrett v. Stratman, 254 F.3d 946, 952 (10th Cir. 2001) ("We must scrupulously avoid second-guessing the district court's determinations regarding whether [plaintiff] has presented evidence sufficient to survive summary judgment." (quotation omitted)). When the factual and legal inquiries blur because the district court fails to make its factual assumptions explicit, we must "undertake a cumbersome review of the record" to ferret out facts that the district court "likely assumed." Behrens, 516 U.S. at 313 (quoting Johnson, 515 U.S. at 319). Those facts explicitly found by the district court, combined with those that it likely assumed,

---

[7](...continued)
case, however, the district court has identified a wide number of disputed facts, at least some of which are legally relevant. Our analysis will thus necessarily disregard those facts which have no bearing on our legal conclusions as we "examin[e] the facts presented on summary judgment in the light most favorable to the plaintiff, to determine whether they amount to a violation of a clearly-established right." Walker v. City of Orem, 451 F.3d 1139, 1155 (10th Cir. 2006).

Defendants also note that in Wilson v. Meeks, 98 F.3d 1247 (10th Cir. 1996), we exercised pendent jurisdiction to reach an issue of evidentiary sufficiency in an interlocutory § 1983 appeal, id. at 1251. We did so, however, only to preserve the law of the case in light of the Supreme Court's intervening decision in Johnson v. Jones, 515 U.S. 204, 316 (1995). Meeks, 98 F.3d at 1251. Outside of such unusual circumstances, we cannot take pendent jurisdiction over otherwise nonreviewable factual determinations, lest we swallow the rule of Johnson.

then form the universe of facts upon which we base our legal review of whether defendants are entitled to qualified immunity.

**B**

Defendants also appeal the district court's denial of summary judgment on several of Fogarty's state-law claims. As explained, we have interlocutory jurisdiction only over the district court's denial of qualified immunity, and thus may reach defendants' state law arguments only by exercising pendent appellate jurisdiction. Swint v. Chambers County Comm'n, 514 U.S. 35, 42 (1995). "It is appropriate to exercise pendent appellate jurisdiction only where resolution of the appealable issue necessarily resolves the nonappealable issue, or where review of the nonappealable issue is necessary to ensure meaningful review of the appealable one." Berrey v. Asarco, Inc., 439 F.3d 636, 647 (10th Cir. 2006).

Defendant Fisher urges us to review the district court's denial of summary judgment on the state-law torts of assault and battery. The district court found a "question of disputed fact about whether it was Defendant Fisher who fired the pepper ball which hit [Fogarty]." Fisher's arguments rest entirely on New Mexico state law and the propriety of the district court's unreviewable factual conclusions. As such, this issue is not "inextricably intertwined with [the district court's] decision to deny . . . qualified immunity," nor is consideration of the issue "necessary to ensure meaningful review of the" qualified immunity rulings.

Swint, 514 U.S. at 51. We therefore decline pendent interlocutory jurisdiction over these state-law claims.

Defendants Nick Gonzales, Hill, and Hubbard also appeal the court's denial of summary judgment on Fogarty's claims of assault and battery, but their briefs present no argument in reference to these issues, and they appear to have been waived. In any event, we have no difficulty concluding that these issues are not inextricably intertwined with the district court's qualified immunity determinations. It would be inappropriate to reach these fact-intensive state-law claims in this appeal.

Finally, John Gonzales, Nick Gonzales, Hill, and Hubbard argue that we should dismiss the state-law false arrest claims against them because they had probable cause to justify Fogarty's arrest. In light of our conclusions regarding probable cause in Part III.A, infra, our resolution of that appealable issue will not "necessarily resolve[] the nonappealable issue" with any finality. Kirkland v. St. Vrain Valley School Dist., 464 F.3d 1182, 1198 (10th Cir. 2006). We therefore decline to exercise jurisdiction over this issue.

## III

A court presented with a summary judgment motion based on qualified immunity must first answer a threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Saucier v. Katz, 533 U.S. 194, 201

(2001). "[T]he next, sequential step is to ask whether the right was clearly established." Id. With regard to this second step, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful" under the circumstances presented. Id. at 202. As we have explained, in an interlocutory appeal we must accept a district court's determination that the evidence is sufficient to support a particular factual inference, Garrett, 254 F.3d at 946, and its closely related conclusion that genuine issues of fact exist for trial, Cortez v. McCauley, 478 F.3d 1108, 1121 n.16 (10th Cir. 2007) (en banc).

Fogarty alleges two Fourth Amendment violations: unlawful arrest and excessive use of force. The district court found that Fogarty had presented evidence sufficient to deny qualified immunity on both claims. On appeal, defendants argue that they are entitled to qualified immunity on both counts because Fogarty's evidence falls short of establishing a deprivation of a clearly established constitutional right. In addition, certain officers raise specific objections to the district court's legal determinations. For purposes of clarity, we first address the district court's general conclusions regarding the lawfulness of Fogarty's arrest and the force used against him, and then separately consider those arguments which relate only to certain individual defendants.

**A**

**1**

- 15 -

We begin with the district court's denial of qualified immunity on Fogarty's allegation of unlawful arrest. Under the Fourth Amendment, arrests are a variety of seizure, which occur "only when, by means of physical force or a show of authority, [an individual's] freedom of movement is restrained." United States v. Mendenhall, 446 U.S. 544, 553 (1980). Defendants do not contest that Fogarty was arrested. As the district court found, APD officers handcuffed Fogarty, moved him through the street against his will, and placed him into custody in a police van.

It is also uncontested that the officers did not have a warrant to arrest Fogarty. Their warrantless arrest of Fogarty therefore violates the Fourth Amendment unless that arrest was supported by probable cause. United States v. Edwards, 242 F.3d 928, 933 (10th Cir. 2001). In evaluating the existence of probable cause, we consider whether the "facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." Id. at 934 (quotation omitted). Our determination on this score is an independent and objective one. Thus an officer's own subjective reason for the arrest is irrelevant, and it does not matter whether the arrestee was later charged with a crime. See Devenpeck v. Alford, 543 U.S. 146, 152-53 (2004); Apodaca v. City of Albuquerque, 443 F.3d 1286, 1289 (10th Cir. 2006).

Central to this analysis is determining which crime, or crimes, defendants could objectively and reasonably have believed that Fogarty committed. Defendants argue that the arresting officers had probable cause to believe Fogarty had violated New Mexico's disorderly conduct statute.[8] N.M. Stat. Ann. § 30-21-1(A) (defining disorderly conduct as "engaging in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct which tends to disturb the peace"). Although Fogarty states that an APD officer told him during his arrest that he was being charged with "inciting a riot," this evidence of an officer's subjective belief does not affect our inquiry. Instead, we concern ourselves only with whether Fogarty's conduct, as viewed objectively and in the light most favorable to Fogarty, could establish probable cause to believe he had engaged in disorderly conduct.

Under New Mexico law, disorderly conduct must meet two requirements. The first requirement is that the conduct itself fall into one of the categories

---

[8] In addition to disorderly conduct, defendants raise, for the first time, two other possible justifications for Fogarty's arrest: parading without a permit in violation of Albuquerque Ordinance § 7-3-3(A), and walking in a street with an adjacent sidewalk in violation of Albuquerque Ordinance § 8-2-7-7(A) and N.M. Stat. Ann. § 66-7-339.

Ordinarily, we do not address issues raised for the first time on appeal, and we decline to do so here. United States v. Alcaraz-Arellano, 441 F.3d 1252, 1260 (10th Cir. 2006). Because the district court did not have the opportunity to address these arguments, it could not determine if genuine issues of material fact existed with regard to these alleged violations, findings which we would be bound to accept in this interlocutory appeal. Consequently, it would be inappropriate to consider these proposed alternate foundations for probable cause.

enumerated in the statute by being violent, abusive, indecent, profane, boisterous, unreasonably loud, or otherwise disorderly.  Id.  The second prong measures the potential effect of the conduct on others, requiring that it "tend to disturb the peace."  State v. Oden, 484 P.2d 1273, 1274 (N.M. App. Ct. 1971) (holding that "tend to disturb the peace" is an independent element of disorderly conduct).  Disturbing the peace requires "an act of violence, or . . . an act likely to produce violence, or which, by causing consternation and alarm, disturbs the peace and quiet of the community."  State v. Florstedt, 419 P.2d 248, 249 (N.M. 1966) (quotation omitted).

Defendants contend that Fogarty's drumming tended to disturb the peace either by directly inciting a crowd to violence, or by preventing the police from controlling unruly protesters by interfering with police communications.  In cases where the allegation of disorderly conduct is premised on the effect of a defendant's expression on others, New Mexico law requires that the evidence, viewed in the light most favorable to the defendant, show that his expression "was likely to incite the listeners to breach the peace."  State v. Hawkins, 991 P.2d 989, 992 (N.M. Ct. App. 1999).  When examining similar allegations, New Mexico courts have consistently focused on the potential for conduct to cause violence or other serious public disruption.  See State v. Doe, 583 P.2d 464, 466 (N.M. 1978) (holding that an angry challenge to a police officer's traffic stop, although made "in a loud voice" and with the defendant's "fist clenched," was not

disorderly conduct because "no act of violence was attempted" nor was it "apparent that [defendant's] words or actions would produce violence or disturb the peace"). By contrast, "the mere fact that people may have heard [an individual's expression], however loud or offensive [it] may have been, is insufficient to support a charge of disorderly conduct." Hawkins, 991 P.2d at 992.[9]

The district court's memorandum opinion contains a cursory summary of the facts upon which it based its finding that officers lacked probable cause to arrest Fogarty. Relying on those facts that the district court explicitly found as well as others in the record that it likely assumed, see Behrens, 516 U.S. at 313, we agree that under Fogarty's version of events, he was arrested without probable cause.

---

[9] The dissent's reliance on State v. Salas, 986 P.2d 482 (N.M. Ct. App. 1999), is misplaced. Just four months after that decision, the New Mexico Court of Appeals held in Hawkins that an arrest for disorderly conduct was illegal. In doing so, it construed Salas quite narrowly, stating that "there was no evidence . . . that Defendant's conduct bothered anyone other than the two officers. Moreover, unlike the situation in Salas, Defendant did not clench his fists or otherwise yell threats at [the arresting officer]." Id. at 488 (emphasis added). Consistent with Doe, the court then approvingly cited an Alabama case for the proposition that expression was not disorderly when it "did not contain a threat and [was] not likely to cause a violent response." Id. (citing Swann v. City of Huntsville, 455 So. 2d 944, 950 (Ala. Crim. App. 1984)) (emphasis added). This careful construction protects the constitutionality of a statute that necessarily penalizes certain types of expression. See State v. James M., 806 P.2d 1063, 1066 (N.M. Ct. App. 1990) (holding that a defendant's disorderly conduct conviction did not violate the First Amendment because he was convicted for expression that amounted to fighting words).

First, as to the nature of his conduct, Fogarty stated that he was not drumming during the protest in an excessively loud manner.  He was drumming only with his hands, even though some of the other protesters were using sticks. By contrast, defendants offered no countervailing evidence regarding the nature of Fogarty's drumming, or testify as to the bare essential fact necessary to establish probable cause:  namely, that they had seen Fogarty drum in a disorderly manner.[10]  Consequently, we cannot say that APD officers had probable cause to arrest Fogarty for being "boisterous" or "unreasonably loud" when the district court found sufficient support in the record for Fogarty's assertion that he was playing at a reasonable volume.

As to the second element, tending to disturb the peace, defendants argue that Fogarty's drumming threatened to incite the crowd to violence and interfered with police communications.  This, they contend, caused traffic to be blocked, disrupted local business, and endangered the safety of the officers.  Fogarty presented contrary evidence to the district court, however.  Viewing this evidence

---

[10] Defendants urge us to invoke the "fellow officer rule," under which probable cause may be established by information collectively known to the police.  Karr v. Smith, 774 F.2d 1029, 1031 (10th Cir. 1985).  As no officer has admitted relaying information to, or receiving information from, fellow officers based on personal observation of Fogarty's behavior, we have no occasion to apply this rule.  Cf. Albright v. Rodriguez, 51 F.3d 1531, 1536-37 (10th Cir. 1995) (holding that officer was entitled to rely on a fellow officer's personal observations of the arrestee's behavior); United States v. Morgan, 936 F.2d 1561, 1569 (10th Cir. 1991) (holding that "reliable" information communicated from a supervising officer, combined with the arresting officer's "personal observations and knowledge," supported probable cause).

in Fogarty's favor, we disagree that his drumming necessarily breached the peace by contributing to the alleged disruptions. For example, Fogarty denied playing his drum in an inciting marching cadence. Another witness stated that the police response, rather than drumming, was inciting the crowd. Finally, if police announcements were indeed unintelligible due to technical malfunctions, Fogarty's drumming would not have breached the peace by preventing the police from controlling the crowd. Indeed, substantial factual disputes exist as to whether the protesters were engaging in peaceful, police-sanctioned expression, or threatening to block interstates and impair public safety. In sum, crediting the facts found by the district court and those that it likely assumed, we are precluded from holding that Fogarty's conduct threatened to incite violence or create "consternation and alarm" as required by New Mexico law. Florstedt, 419 P.2d at 249.

The defendants' arguments that the police had probable cause to arrest Fogarty rest only on characterizations of the protest in general, and not on evidence of Fogarty's individual actions. The Fourth Amendment plainly requires probable cause to arrest Fogarty as an individual, not as a member of a large basket containing a few bad eggs. In other words, that Fogarty was a participant in an antiwar protest where some individuals may have broken the law is not enough to justify his arrest. See NAACP v. Claiborne Hardware Co., 458 U.S. 886, 908 (1982) ("The right to associate does not lose all constitutional protection

merely because some members of the group may have participated in conduct . . . that itself is not protected."); Jones v. Parmley, 465 F.3d 46, 59 (2d Cir. 2006) (holding that officers could not have thought indiscriminate arrests were lawful when "a few individuals within [a protesting] crowd had violated the law at an earlier time and then desisted"); Barham v. Ramsey, 434 F.3d 565, 574 (D.C. Cir. 2006) (holding that "[v]ague allegations that 'demonstrators' committed offenses will not compensate" for a failure to show any objective basis for arresting individual protesters); cf. Mangieri v. Clifton, 29 F.3d 1012, 1017-18 (5th Cir. 1994) (granting qualified immunity to officers who, when responding to a noise complaint, personally witnessed a protester using a bullhorn at full volume and observed that these actions had an effect on bystanders).

**2**

Although we conclude that Fogarty has sufficiently alleged a constitutional violation, defendants are entitled to qualified immunity unless Fogarty can also show that the constitutional right they violated was clearly established. Saucier, 533 U.S. at 201. In the context of an unlawful arrest our analysis is simple, for "[t]he law was and is unambiguous: a government official must have probable cause to arrest an individual." Cortez, 478 F.3d at 1117 (citing Tennessee v. Garner, 471 U.S. 1, 7 (1985)). Equally unambiguous are the New Mexico cases resolving the scope of the disorderly conduct statute. Under Fogarty's version of events—that he was peacefully drumming a samba at a reasonable volume—well-

settled constitutional and state-law precedent would have put reasonable officers on notice that they lacked probable cause to effectuate an arrest. See Medina v. City & County of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992) (holding that a right is clearly established if there is "a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts" holds such a right to exist). Defendants are therefore not entitled to qualified immunity on Fogarty's claim of unlawful arrest at this stage of the litigation.

We underscore that these conclusions regarding probable cause are compelled by our constrained jurisdiction and our view of the facts in the light most favorable to Fogarty. Most of the deposed officers denied even witnessing Fogarty's arrest, and none admitted to physically arresting him. Their depositions therefore contain little that might contradict Fogarty's account of his own behavior. If defendants demonstrate at trial that the arresting officers had objective reason, even if mistaken, for believing that Fogarty's drumming tended to disturb the peace by increasing the potential for violence or public alarm as defined by the New Mexico courts, they may well be entitled to qualified immunity. But on the record before us, we cannot at this juncture reach such a conclusion as a matter of law.

**B**

Next, defendants challenge the district court's denial of qualified immunity on Fogarty's excessive use of force claim. In the court below, Fogarty claimed

that APD officers used excessive force in three ways: by forcibly dragging him across Central Avenue during his arrest while hyperflexing his wrist, by exposing him to tear gas, and by shooting him with a pepper ball or some other type of projectile. As with Fogarty's unlawful arrest claim, we review only whether the facts viewed in the light most favorable to Fogarty entitle the defendants to qualified immunity as a matter of law.[11]

**1**

Like Fogarty's unlawful arrest claim, his excessive force claim is grounded in the Fourth Amendment. Our inquiry on this claim focuses on whether the force used by the APD was reasonable under the facts and circumstances presented. See Graham v. Conner, 490 U.S. 386, 396 (1989). In particular, we must pay "careful attention" to factors such as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers and others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. We also consider whether an officer's own "reckless or deliberate conduct" in connection with the arrest contributed to the need to use the force employed.

---

[11] The dissent contends that the defendant officers, except for John Gonzales, have waived their legal challenge to the excessive force claim. Fogarty, however, regarded these arguments sufficiently presented by the plaintiffs' briefs to address them extensively in his response. Cf. Stump v. Gates, 211 F.3d 527, 533 (10th Cir. 2000) (declining to reach issue when "we did not have the benefit of the appellee's response"). The defendants, in turn, expounded on these legal arguments in more detail in their consolidated reply brief. This is therefore not a clear-cut case of waiver, and we find the defendants' excessive force arguments adequately raised and developed to require our review.

Jiron v. City of Lakewood, 392 F.3d 410, 415 (10th Cir. 2004); Medina v. Cram, 252 F.3d 1124, 1132 (10th Cir. 2001).

Our analysis is again an objective one: "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396. Although we have concluded that Fogarty's arrest was not supported by probable cause, this does not mean that the force used to arrest him was automatically excessive, as the two inquiries are entirely independent. See Cortez, 478 F.3d at 1126-27 ("[I]n a case where police effect an arrest without probable cause . . . but use no more force than would have been reasonably necessary if the arrest or the detention were warranted, the plaintiff has a claim for unlawful arrest or detention but not an additional claim for excessive force.").

First, we consider the severity of the crime at issue. As discussed, defendants contend that Fogarty engaged in disorderly conduct. Disorderly conduct, under New Mexico law, is only a petty misdemeanor, the least serious of the three classes of state criminal offenses. See N.M. Stat. Ann. §§ 30-20-1, -1-6 (defining felonies, misdemeanors, and petty misdemeanors). Assuming for the purposes of our independent excessive force analysis that Fogarty had indeed committed disorderly conduct, his infraction would be among the least severe crimes contemplated by New Mexico law, and the amount of force used should have been reduced accordingly. See Casey v. City of Fed. Heights, 509 F.3d

- 25 -

1278, 1281 (10th Cir. 2007) (holding that when a plaintiff is suspected of committing a minor misdemeanor, this fact "reduces the level of force that was reasonable [for an officer] to use").

Second, viewing the evidence presented to the district court in the light most favorable to Fogarty, we find no suggestion that he posed an immediate threat to the safety of the officers or others. At the point when the officers used force against him, Fogarty was kneeling on the steps of the bookstore. He was unarmed and had been drumming intermittently and peacefully. Even if his behavior played a role in inciting the crowd to remain in the middle of Central Avenue, which is contrary to Fogarty's version of events, it remains far from clear that the protesters presented any immediate threat to the officers or public safety. In denying qualified immunity, the district court had before it testimony that the officers' main priorities in dispersing the protesters were reopening the street to traffic and avoiding disruption to local businesses, not quelling an immediate threat of violence. Under the district court's view of the evidence, Fogarty's behavior presented no immediate threat to anyone's physical safety. Accordingly, this factor also suggests that the force used against Fogarty was unreasonable.

Third, Fogarty was neither actively resisting arrest nor attempting to evade arrest by flight. After reviewing the record, the district court found that "[n]o police officer notified [Fogarty] that he was under arrest, nor did they ask him to

come along peacefully." It concluded that "[t]here is no indication, even by Defendants' version, that Plaintiff ever resisted arrest or attempted to evade arrest, which would have called for the use of a higher degree of force." This factor therefore also tilts the scale in the direction of unreasonable force. See Casey, 509 F.3d at 1282.

Finally, Fogarty presented evidence indicating that the police may have contributed to the need to use force. Fogarty stated that APD's decision to block off Central Avenue led him to believe that police were allowing protesters to march in the streets. In addition, one witness stated that the protest was peaceful until police "enraged" the crowd by initiating "unnecessary" arrests. Although perhaps less persuasive than the other three factors, these contentions, if true, would also suggest that APD used more force than reasonable.

On the other side of the reasonableness scale, the amount of force used by police against Fogarty was considerable. Fogarty alleges that he was hit with a rifle-fired projectile while standing on UNM property. He then claims that four to five officers grabbed him, thrust him to the ground, and forcibly escorted him through a cloud of tear gas. When he began having difficulty breathing, officers allegedly used "an incredible amount of force" to put his wrist into a painful hyperflexion position. According to Fogarty, this use of force lasted from three to five minutes and resulted in a torn tendon. Fogarty also testified that APD's use of chemicals had a significant effect on him. Because the tear gas prompted

an acute asthma attack, Fogarty, a medical doctor, stated that he "thought [he] was going to die." Given that each of the Graham factors balances in Fogarty's favor, we hold that this level of force was unreasonable under the circumstances Fogarty recounts.

**2**

Fogarty must also show that defendants' use of force violated clearly established law. Saucier, 533 U.S. at 201. "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Medina, 960 F.2d at 1498. "The difficult part of this inquiry is identifying the level of generality at which the constitutional right must be 'clearly established.'" Casey, 509 F.3d at 1284.

Although the general factors outlined in Graham are insufficiently specific to render every novel use of excessive force unreasonable, "[w]e cannot find qualified immunity wherever we have a new fact pattern." Id. Thus, our circuit uses a sliding scale to determine when law is clearly established. Id. Under this approach, "[t]he more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." Id. (quoting Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004)). Relevant here, "Graham establishes that force is least

justified against nonviolent misdemeanants who do not flee or actively resist arrest." Casey, 509 F.3d at 1285.

With respect to the use of pepper balls and tear gas, we acknowledge that our precedential opinions have not directly addressed the Fourth Amendment implications of what defendants call "less lethal" munitions. Nevertheless, a reasonable officer would have been on notice that the Graham inquiry applies to the use of these methods just as with any other type of pain-inflicting compliance technique. We find it persuasive that, in prior cases, we have assumed that the use of mace and pepper spray could constitute excessive force. See DeSpain v. Uphoff, 264 F.3d 965, 978 (10th Cir. 2001) ("[P]epper spray . . . implicates the excessive use of force" in the Eighth Amendment context.); Martinez v. N.M. Dep't of Pub. Safety, 47 Fed. Appx. 513, 516-17 (10th Cir. 2002) (unpublished) (citing LaLonde v. County of Riverside, 204 F.3d 947, 961 (9th Cir. 2000)) (holding that a reasonable officer would have known that the use of mace against an arrestee who "posed no threat" and "was no risk of flight" amounted to excessive force); accord Vinyard v. Wilson, 311 F.3d 1340, 1355 (11th Cir. 2002); Headwaters Forest Def. v. County of Humboldt, 276 F.3d 1125, 1130 (9th Cir. 2002); Park v. Shiflett, 250 F.3d 843, 853 (4th Cir. 2001). Considering that under Fogarty's version of events each of the Graham factors lines up in his favor, this case is not so close that our precedents would fail to portend the constitutional unreasonableness of defendants' alleged actions.

We likewise conclude that it would be apparent to a reasonable officer that the use of force adequate to tear a tendon is unreasonable against a fully restrained arrestee. See Smith v. Mattox, 127 F.3d 1416, 1419-20 (11th Cir. 1997) (denying qualified immunity when an officer broke an arrestee's arm in the course of restraining him, even in the absence of prior circuit precedent arising under the same facts). Viewing the facts in the light most favorable to Fogarty, we conclude that defendants cannot avail themselves of qualified immunity at this stage of the litigation.

**IV**

We next address defendants' arguments regarding their personal liability for alleged constitutional violations under § 1983. Defendants raise two related, but distinct, lines of argument. First, several defendants argue that, contrary to the district court's view of the evidence in the light most favorable to Fogarty, they simply were not present for the alleged use of excessive force. These are fact-based arguments that we cannot reach on interlocutory appeal. Citing relevant case law, however, defendants also argue that, even under the facts alleged by Fogarty, clearly established law precludes § 1983 liability. Although their specific arguments differ, a common principle governs each: "Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation." Foote v. Spiegel, 118 F.3d 1416, 1423 (10th Cir. 1997). Personal involvement is not limited solely to situations where a defendant violates

a plaintiff's rights by physically placing hands on him.  We have recognized at least two other ways in which a plaintiff may show a defendant's involvement. An officer who fails to intervene to prevent a fellow officer's excessive use of force may be liable under § 1983.  Mick v. Brewer, 76 F.3d 1127, 1136 (10th Cir. 1996).  This duty was clearly established law at the time of Fogarty's arrest.  See id.

In addition, supervisors may be liable for a subordinate's constitutional deprivations under certain circumstances.  As a general matter, § 1983 does not recognize a concept of strict supervisor liability; the defendant's role must be more than one of abstract authority over individuals who actually committed a constitutional violation.  Jenkins v. Wood, 81 F.3d 988, 994-95 (10th Cir. 1996). Yet in situations where an "'affirmative link' exists between the constitutional deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise," the supervisor may be personally liable.  Butler v. City of Norman, 992 F.2d 1053, 1055 (10th Cir. 1993).

## A

We apply these principles to John Gonzales' appeal.  John Gonzales argues that he cannot be held liable for Fogarty's unlawful arrest or the excessive use of force because he did not participate in either constitutional violation.  In denying summary judgment to John Gonzales, the district court found that:  (1) John Gonzales was directly involved in Fogarty's arrest by virtue of giving the arrest

order, (2) There were disputed issues of material fact regarding his opportunity to intervene in the excessive use of force, and (3) John Gonzales exercised supervision and control over the arresting officers.

With regard to John Gonzales' direct involvement in Fogarty's arrest, the district found that John Gonzales either explicitly ordered that the drummers be arrested, or ordered that their drums be taken and that arrests be made as a last resort. Under either set of facts, the district court reasoned that Fogarty was arrested as a result of John Gonzales' direct order. Accordingly, if John Gonzales indeed lacked probable cause to justify the arrests, his order would be unconstitutional and would create liability under § 1983. See Barham, 434 F.3d at 577-78 (denying qualified immunity to a police chief in an interlocutory appeal when the extent of his involvement in a mass arrest was disputed by the parties).

As for the excessive force claim, the district court considered both John Gonzales' involvement with the general deployment of tear gas and projectiles, and his role in Fogarty's arrest. With regard to the former, it found that John Gonzales gave orders to subordinates, moved through the crowd supervising the event, and personally ordered the use of the tear gas that caused some of Fogarty's injuries. These facts, if borne out at trial, show sufficient direct responsibility for the use of force to deny qualified immunity at this stage.

The district court also found John Gonzales potentially liable for the force used during Fogarty's arrest, recounting Fogarty's statement that an officer who

was not wearing a gas mask or holding a shield witnessed his arrest. This description comported with John Gonzales' characterization of his own attire. In the district court's view, this was sufficient to support an inference that John Gonzales may have witnessed Fogarty's arrest without stopping the excessive use of force.

Bound by the district court's reading of the evidence, we turn to the legal question of John Gonzales' indirect liability. Under this circuit's clearly established law, if John Gonzales were indeed present at Fogarty's arrest with an opportunity to prevent the excessive use of force, he would have had a duty to intervene. See Mick, 76 F.3d at 1136. In Jenkins, 81 F.3d at 995, we found that the defendant bore no personal liability for alleged Fourth Amendment violations because he arrived on the scene after the alleged constitutional deprivations had occurred, and he assisted in remedying the situation once he arrived.[12] By contrast, Fogarty contends that John Gonzales set the wheels of the alleged constitutional deprivation in motion and that he may have stood by and witnessed Fogarty's arrest and resultant injuries. We thus cannot hold at this stage in the litigation that John Gonzales is entitled to qualified immunity on Fogarty's claim of excessive force.

---

[12] Jenkins declined to address whether either defendant was liable as a supervisor, deeming these arguments waived. Id. at 996.

- 33 -

Finally, the district court found supervisory liability for John Gonzales. It reasoned that as the incident commander who planned the APD response to the protest, ordered certain arrests, and controlled the deployment of chemical munitions and less lethal projectiles, John Gonzales could be held liable under § 1983 as a supervisor. John Gonzales counters that he took extreme measures to limit the use of force during the protest and refused a gas mask or other protection so that he might act as a "barometer" for the intensity of the gas. At trial, these claims may bolster his assertions that he used only reasonable force, but they also establish his detailed involvement with the mechanics of APD's reaction to the protest.

Viewing the district court's findings in the light most favorable to Fogarty, we agree with its legal conclusion that an "affirmative link" exists between John Gonzales' actions and the alleged constitutional deprivations. At the very least, under Fogarty's version of the facts, John Gonzales "set[] in motion a series of acts by others . . . , which he knew or reasonably should have known, would cause others to inflict the constitutional injury." Motley v. Parks, 383 F.3d 1058, 1067 (9th Cir. 2004) (quotation omitted). We thus affirm the district court's denial of qualified immunity to John Gonzales.

**B**

Fogarty alleged that Hill and Keith failed to intervene in the arrest and excessive use of force, and that they were liable as supervisors. For both

defendants, the district court denied summary judgment, reasoning that Fogarty had presented enough evidence to proceed to trial on a theory of supervisory liability. In addition, it found that Hill could be directly liable for failing to intervene in the excessive use of force. On appeal, Hill and Keith contend that the evidence presented to the district court, even viewed in the light most favorable to Fogarty, does not meet the legal standards we have articulated above for indirect personal § 1983 liability.

**1**

The district court found that Hill "supervised the arrest and was present when the group of line officers were dispatched to carry out the arrest," and concluded that this fact raised an inference of a duty to intervene. Hill argues that a police officer must have a "realistic opportunity" to prevent an attack in order to incur § 1983 liability. O'Neill v. Krzeminski, 839 F.2d 9, 11 (2d Cir. 1988) (holding that defendant had no duty to intervene when "three blows were struck in such rapid succession that [the defendant] had no realistic opportunity to attempt to prevent them"); see also Lusby v. T.G. & Y. Stores, Inc., 749 F.2d 1423, 1433 (10th Cir 1984), vacated on other grounds, 474 U.S. 805 (1985) (reasoning that defendant officers were potentially liable when they "could have prevented or stopped" a fellow officer's assault). Yet Fogarty described the arrest as lasting between three and five minutes. This, coupled with the district court's finding that Hill was present for the arrest, supports a conclusion that Hill had the

opportunity to prevent Fogarty's injuries. If a jury were to credit Fogarty's version of events, he could indeed establish Hill's failure to intervene. The district court was correct to deny qualified immunity.

We also conclude that these same facts, if true, could support an "affirmative link" between Hill and Fogarty's arrest such that Hill could be accountable under a theory of supervisory liability. In addition, the district court found that Hill gave direct orders to arrest Fogarty. In light of these factual findings, we conclude that Fogarty has sufficiently indicated Hill's "exercise of control or direction" over his arrest to survive summary judgment.

Defendants also argue that Fogarty did not allege a separate "failure to intervene" count in his second amended complaint. Accordingly, they contend that the district court erred in denying summary judgment on this basis. We disagree. Heightened pleading is not required in § 1983 cases, rather the pleadings must "make clear the 'grounds' on which the plaintiff is entitled to relief." Robbins v. Oklahoma, ___ F.3d ___, 2008 WL 747132, at *4 (10th Cir. Mar. 21, 2008); see also Currier v. Doran, 242 F.3d 905, 916-17 (10th Cir. 2001). Fogarty has met this requirement. He clearly alleged that "Hill stood by as another APD officer shoved a knee into [Fogarty's] back" and that all defendants, with the exception of Keith, "used or permitted" physical force in the course of the arrest (emphasis added). Fogarty's allegations were therefore sufficiently

clear to put defendants on notice that the alleged constitutional violations were predicated, in part, on their alleged failure to intervene.

2

In reviewing Fogarty's claims against Keith, the district court acknowledged that "[t]he undisputed facts demonstrate no connection between Defendant Keith and Plaintiff's claims of unlawful arrest [or] excessive force," and thus he was entitled to summary judgment on these counts. It did find, however, that Keith was "in the vicinity of [Fogarty's] arrest" and was assigned to supervise ERT officers. Based on these facts, as well as "the persistent obfuscation of the identities of the arresting officers," the district court held that Keith was not entitled to summary judgment on Fogarty's § 1983 supervisory liability claim.

We give full credit to the district court's conclusions regarding the sufficiency of Fogarty's evidence that Keith may have been in the general area of the arrest. We cannot agree, however, with the district court's legal conclusion. Fogarty presented no evidence that Keith ordered, directed, or even knew of either Fogarty's arrest or the deployment of a nonlethal projectile against him, nor did the district court make any factual inferences that would present a legal basis for Keith's liability. Further, it is undisputed that Keith did not deploy any tear gas. We thus cannot discern an "affirmative link" between Keith's alleged actions and Fogarty's arrest. Absent allegations "of personal direction or of

actual knowledge and acquiescence," Keith is entitled, as a matter of law, to qualified immunity on all of Fogarty's § 1983 claims. Johnson v. Martin, 195 F.3d 1208, 1219 (10th Cir. 1999) (quotation omitted).

## C

Finally, we review the district court's denial of qualified immunity to Hubbard and Nick Gonzales, who were members of a SWAT team located near the bookstore during the protest. Both officers argue that the district court should have granted summary judgment in their favor on Fogarty's unlawful arrest and excessive use of force claims because they played no role in arresting Fogarty.

Although both officers denied any involvement in Fogarty's arrest, the district court found that Fogarty had presented evidence sufficient to create a genuine issue of fact on this point. Based on Hill's testimony that he recalled both Nick Gonzales and Hubbard as members of the team charged with arresting the drummers, the district court concluded that there was sufficient circumstantial evidence of actual personal involvement to preclude summary judgment. This being an interlocutory appeal, we cannot second guess the district court's factual determinations regarding Nick Gonzales' and Hill's potential involvement in the unlawful arrest and excessive use of force. See Walker, 451 F.3d at 1155.

Nick Gonzales and Hubbard next attempt to frame the district court's disposition as legal error, contending that it engaged in impermissible credibility determinations regarding their testimony. On summary judgment, a district court

may not weigh the credibility of the witnesses.  See Seamons v. Snow, 206 F.3d 1021, 1026 (10th Cir. 2000).  Practically speaking, this means that the court may not grant summary judgment based on its own perception that one witness is more credible than another; these determinations must be left for the jury.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  We think it clear that the court below did not make a credibility determination.  Instead, it found a material question regarding the officer's credibility.  By denying summary judgment, it appropriately left the resolution of that question to a jury.

V

For the reasons explained, we **AFFIRM** the district court's denial of summary judgment to John Gonzales, Nick Gonzales, Steven Hill, and Dave Hubbard, **REVERSE** the denial of summary judgment to Donald Keith, and **DISMISS** defendants' state-law appeals for lack of jurisdiction.

<u>Fogarty v. Gallegos</u>, 06-2238 & 06-2279

**EBEL**, Circuit Judge, Dissenting.


I must respectfully dissent from the majority opinion for several reasons. First, I believe that the district court erred when it denied the defendants summary judgment on Fogarty's Fourth Amendment unlawful arrest claim. The record demonstrates that the defendants were not unreasonably mistaken that probable cause supported the arrest. Second, I believe that Fogarty's state law false arrest claim is inextricably intertwined with his Fourth Amendment unlawful arrest claim. Therefore, I believe we should exercise pendent jurisdiction and reverse the district court's denial of summary judgment for Captain Gonzales on this claim. Third, I do not believe that we have appellate jurisdiction over the officers' appeal of the denial of summary judgment on Fogarty's Fourth Amendment excessive force claim. The officers solely argue that there is no evidence in the record to support the district court's decision to deny summary judgment. We lack jurisdiction to review a dispute with the district court's determination that a genuine issue of material fact precludes summary judgment. Finally, for the same reason, I believe we lack appellate jurisdiction over the defendants' appeal regarding the denial of summary judgment for Fogarty's supervisory liability claim.

## I.    Unlawful Arrest

The majority, in rejecting the defendants' argument that probable cause supported Fogarty's arrest, relies on its interpretation of the New Mexico disorderly conduct statute and related precedent.  My reading of that precedent, however, dictates a different result.  As part of its probable cause analysis, the majority interprets § 30-20-1 narrowly and thus concludes that the statute prohibits only conduct that is likely "to cause violence or other serious public disruption."  Maj. Op. at 19.  The majority reaches this result, in large part, because I believe it overlooks a fundamental legal issue in the case law.

The New Mexico Supreme Court has explained that § 30-20-1 prohibits conduct that "<u>tends</u> to disturb the peace . . . by causing consternation and alarm." <u>State v. Doe</u>, 583 P.2d 464, 466 (N.M. 1978) (emphasis added).  The New Mexico Supreme Court has not addressed § 30-20-1 since <u>Doe</u>; however, in <u>State v. Salas</u>, the New Mexico Court of Appeals held that conduct falling well short of a "serious public disruption" breaches the peace.  986 P.2d 482, 487 (N.M. Ct. App. 1999).  In <u>Salas</u>, the court held that the defendant's mere use of profanity "tend[ed] to disturb the peace" because the defendant's comments appeared to offend one woman standing nearby.  <u>Id.</u>  Thus, the court held that probable cause justified the arrest.  <u>See id.</u> ("[T]he only requirement is that Defendant's actions disturb the public peace.  A reasonable officer could well conclude, while at the scene of this occurrence, that the woman walked against the wall avoiding

- 2 -

Defendant because of consternation and alerted [the officer] because . . . Defendant's behavior was disturb[ing] the peace and quiet of the community." (internal quotation marks and citation omitted) (quoting Doe, 583 P.2d at 466)).

Salas demonstrates that the majority's interpretation of § 30-20-1 is unduly narrow. The majority, however, attempts to avoid Salas by contending that the court of appeals narrowly construed that opinion in a more recent case. See State v. Hawkins, 991 P.2d 989, 993 (N.M. Ct. App. 1999). I believe the majority's conclusion overlooks a fundamental legal issue relevant to the holdings in both Salas and Hawkins: the fact that New Mexico "holds police officers to a higher standard of tolerance for abuse or offensive language." Hawkins, 991 P.2d at 992.

In Hawkins, the evidence revealed that the only bystanders that possibly could have been disturbed by the defendant's "loud or offensive" remarks were the two police officers at the scene. Id. Accordingly, the court, relying on the higher standard of tolerance New Mexico requires of police officers, held that the effect of the defendant's remarks on the officers was insufficient to establish probable cause. Id. In contrast, the record in Salas demonstrated that the defendant's conduct disturbed a non-police bystander and that the defendant approached the officer in an aggressive manner, with his fists clenched. Salas, 986 P.2d at 488. Although the Hawkins court focused on the latter factor, which distinguished the factual records of the two cases, that focus does not alter the

- 3 -

fact that the court in <u>Salas</u> expressly based its holding <u>solely</u> on the effect of the defendant's conduct on a non-police bystander.[1] <u>See</u> <u>id.</u> at 488–89 ("Defendant was <u>not arrested for his actions toward [the officer]</u>, other people were present, and the district court found that Defendant disturbed a member of the public. [The officer] had probable cause to arrest Defendant for disorderly conduct." (emphasis added)). Thus, the <u>Salas</u> court's broad interpretation of § 30-20-1 remains binding New Mexico law.

Based on this reading of New Mexico precedent, I believe that the defendants had probable cause for two reasons. First, § 30-20-1 only requires conduct that "<u>tends</u> to disturb the peace." N.M. Stat. Ann. § 30-20-1 (emphasis added). Second, our precedent dictates that police officers are entitled to qualified immunity even if they are reasonably mistaken about the presence of probable cause. <u>See</u> <u>Baptiste v. J.C. Penney Co.</u>, 147 F.3d 1252, 1256 (10th Cir.

---

[1] The majority also asserts that <u>Hawkins</u> narrowly construed <u>Salas</u> by citing an Alabama case for the proposition that "[an] expression was not disorderly when it 'did not contain a threat and [was] not likely to cause a violent response.'" Maj. Op. at 19 n.9 (quoting <u>Hawkins</u>, 991 P.2d at 993). By selectively quoting this passage, the majority's assertion misconstrues the court's language in <u>Hawkins</u>. The complete passage explains that the Alabama court held that a defendant's protests regarding an arrest did not support a conviction for disorderly conduct because the comments "did not contain a threat and were not likely to cause a violent response <u>by the police officer to whom they were addressed, especially in view of probable training the officer received for dealing with similar situations</u>." <u>Hawkins</u>, 991 P.2d at 993 (emphasis added). The complete language of this passage further underscores the factual distinctions between <u>Salas</u> and <u>Hawkins</u> and thus does not demonstrate that the <u>Hawkins</u> court was construing <u>Salas</u> narrowly.

1998) ("Even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity." (internal quotation marks omitted) (quoting <u>Romero v. Fay</u>, 45 F.3d 1472, 1476 (10th Cir. 1995)). Although we construe the record in the light most favorable to Fogarty, we evaluate whether that record supports probable cause based on the facts and circumstances "as they would have appeared to prudent, cautious and trained police officers." <u>United States v. Davis</u>, 197 F.3d 1048, 1051 (10th Cir. 1999). The combined effect of these two factors entitles the defendants to qualified immunity. The record illustrates that Fogarty participated in a drum circle during the protest and that the <u>defendants</u> perceived the drums to be one source of interference with their ability to communicate with the crowd of protestors. Thus, it was reasonable for the defendants to conclude that, from their perspective, the drumming was unreasonably loud and therefore tended to disturb the peace. The defendants therefore reasonably determined they had probable cause to arrest Fogarty, and accordingly, the district court erred by denying the defendants qualified immunity for the Fourth Amendment unlawful arrest claim.

## II.	Pendent Jurisdiction

The question of pendent jurisdiction over Fogarty's state law false arrest claim relates to the unlawful arrest analysis. We should exercise pendent jurisdiction over Captain Gonzales' appeal on this issue because the Fourth Amendment unlawful arrest and the state law false arrest claims are "inextricably intertwined."[2] Swint v. Chambers County Comm'n, 514 U.S. 35, 51 (1995). Based on this exercise of our pendent jurisdiction and the determination that the defendants possessed probable cause, I believe the district court should have granted Captain Gonzales summary judgment on this state law claim.

## III.	Excessive Force

In contrast to the majority opinion, I do not believe that we have appellate jurisdiction to consider the officers' argument on appeal for this claim.[3] The district court concluded that summary judgment was inappropriate because disputed issues of material fact existed regarding the officers' involvement with

---

[2] The officers waived this issue by failing to raise it in their initial brief. See United States v. Martinez, ___ F.3d ___, 2008 WL 554812, at *3 n.2 (10th Cir. Mar. 3, 2008). Accordingly, I agree with the majority's decision to decline to exercise pendent jurisdiction over this claim against the officers.

[3] I agree with the majority opinion, however, that we have appellate jurisdiction to consider Captain Gonzales' argument regarding whether the use of nonlethal munitions constitutes excessive force because Captain Gonzales raised that legal argument in his opening brief. I also agree that Sergeant Hill raised an abstract legal argument regarding Fogarty's allegation of a failure to intervene during the use of excessive force. Accordingly, we have appellate jurisdiction to consider that issue.

the use of force.  On appeal, the officers contend only that the district court erred

because there was no evidence in the record to support Fogarty's allegations of

excessive force.[4]

We cannot exercise appellate jurisdiction over an interlocutory appeal if the

defendant only contests the district court's determination that a dispute of

material facts remains.  See Walker v. City of Orem, 451 F.3d 1139, 1154 (10th

Cir. 2006) ("A defendant may not immediately appeal a district court's order

denying qualified immunity, however, merely to dispute the district court's

conclusions that plaintiff's claims are supported by sufficient evidence in the

record or that disputed issues of material fact exist which preclude summary

judgment.").  The officers do not contend that the district court misapplied the

law.  Instead, they contest only the district court's conclusion that the presence of

disputed material facts precludes summary judgment.  Therefore, pursuant to

Walker, we may not exercise appellant jurisdiction and should dismiss this aspect

of the appeal rather than affirm the district court's decision.

---

[4] Although the officers raise an abstract legal argument in their reply brief—they contend that the amount of force used was reasonable—we generally decline to consider arguments raised for the first time in a reply brief, and I see no reason to vary from that practice here.  The precise amount of force administered, and by whom, remain factual issues still in controversy.  Martinez, 2008 WL 554812, at *3 n.2.

## IV.    Supervisory Liability

The defendants contend that the district court erred by denying them qualified immunity because there is "no evidence" linking the supervisory officers to the use of excessive force.  In contrast, the district court concluded that summary judgment was not appropriate because genuine factual issues remained.  As noted above, we may not consider the defendants' argument that the district court erred because no genuine factual issues exist.  Therefore, we must also dismiss this aspect of the appeal.