1999-NMCA-126

991 P.2d 989

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Eric L. HAWKINS, Defendant–Appellant.**

**No. 20,187.**

Court of Appeals of New Mexico.

Sept. 3, 1999.

Patricia A. Madrid, Attorney General, William McEuen, Assistant Attorney General, Santa Fe, for Appellee.

Phyllis H. Subin, Chief Public Defender, Santa Fe, Perry C. Abernethy, Abernethy Law Office, P.C., Hobbs, for Appellant.

## OPINION

BUSTAMANTE, Judge.

{1} Defendant appeals from his convictions for trafficking a controlled substance and for disorderly conduct. We issued a calendar notice proposing summary reversal. The State responded with a timely memorandum in opposition to our proposed disposition. *See* Rule 12–210(D)(3) NMRA 1999. Having carefully reviewed the State's arguments, and being unpersuaded, we reverse.

## FACTS

{2} In the early afternoon of May 27, 1998, two Hobbs police officers, Officers Durham and Porter, saw someone drive through a red light. The officers recognized the driver and believed he had a revoked driver's license. The officers did not pursue the driver immediately because they were involved with another matter. Several minutes later, however, they saw the driver beginning to back his car out of the driveway of Defendant's house. When the driver saw the officers' car, he got out of his vehicle and began to walk in a hurry, as if he was attempting to avoid contact with the officers, toward the backyard of Defendant's house, where there were workmen installing a swimming pool. The officers stopped their vehicle in front of Defendant's house. Officer Durham got out of the vehicle and made contact with the driver in Defendant's backyard, where the driver was watching the workmen. Officer Durham performed a check on the driver through Hobbs police records and confirmed that he had a suspended driver's license. As a result, the officers arrested the driver.

{3} While Officer Porter detained the driver, Officer Durham walked from the front of Defendant's house to the backyard and began searching to see if the driver had disposed of any contraband. Officer Durham did not find any contraband in Defendant's backyard, but he testified at trial, over Defendant's objection, that the driver was a known crack addict and that Officer Durham had previously arrested some people who had left Defendant's house with crack cocaine. Officer Durham also testified, again over Defendant's objection, that he had, in the preceding few months, received a considerable amount of information that crack cocaine was being sold from Defendant's house.

{4} Defendant, who had been watching from his front porch, followed Officer Durham when Officer Durham walked to the backyard. As he reached the side of the house, Defendant yelled at Officer Durham, "This isn't a fucking crack house. Get out of my fucking yard." Officer Durham testified that this was yelled in an offensive manner and that the workers installing the swimming pool in Defendant's backyard heard the statement. Officer Durham also testified that Defendant's house was located in a residential neighborhood. Officer Durham searched Defendant after arresting him for disorderly conduct.

{5} Officer Porter testified that he was seventy-five feet away from the confrontation but that he also heard Defendant yelling and cursing. Officer Porter further testified he thought there was a fight and that Defendant's words were loud enough for neighbors to hear. Officer Porter was also allowed to testify, over Defendant's objection, that a crack house is a place from which it has been determined crack cocaine is sold on a consistent basis and that people go to crack houses to purchase, smoke, and sell crack cocaine.

{6} Officers Durham and Porter transported Defendant and the driver they had arrested earlier to the Hobbs city jail, where both men were strip searched. During the strip search, a plastic bag containing a six-gram rock of crack cocaine was found in Defendant's rectum. The officers and a drug

analyst testified that, in their experience, this amount of crack cocaine is more than would normally be for personal use; rather, it is an amount consistent with selling to others. Defendant was convicted of trafficking a controlled substance (cocaine) in violation of NMSA 1978, § 30–31–20 (1990), and of disorderly conduct in violation of NMSA 1978, § 30–20–1 (1967). This appeal followed.

{7} On appeal Defendant argues that (1) the trial court erred in admitting testimony from the officers that (a) the person who drove into Defendant's driveway was a known crack addict; (b) the officers had arrested some people who had previously left Defendant's house with crack cocaine; (c) the officers had received a lot of information over the preceding few months that crack cocaine was being sold from Defendant's house; (d) a crack house is a place from which it has been determined that crack cocaine is sold on a consistent basis and that people go there to buy cocaine; and (e) that crack cocaine is often bought, sold, and smoked at Defendant's house. Defendant also argues that (2) the trial court erred in failing to grant a directed verdict on the disorderly conduct charge, (3) there was insufficient evidence to support Defendant's conviction for disorderly conduct, (4) the disorderly conduct statute is void for vagueness and is overbroad, (5) the trial court erred in denying Defendant's motions to suppress and to dismiss due to the illegality of Defendant's arrest, and (6) the trial court erred in failing to suppress as evidence the rock of cocaine seized from Defendant because it was tainted as the fruit of an illegal detention. Given our disposition of the case, we need not address Issues 1, 4, and 5.

*DISCUSSION*

*Disorderly Conduct Conviction*

■ {8} Our calendar notice proposed to hold that Defendant's disorderly conduct conviction should be dismissed because there was not sufficient evidence to support that conviction. The State, of course, contends the evidence was sufficient.

{9} Section 30–20–1(A) prohibits anyone from "engaging in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct which tends to

disturb the peace." Disorderly conduct is a petty misdemeanor. *See id.* The State relies on *State v. James M.*, 111 N.M. 473, 806 P.2d 1063 (Ct.App.1990), in support of its contention that Defendant's actions constituted disorderly conduct. The State emphasizes that there was evidence that Defendant advanced upon the officer and was waving his arms while yelling at Officer Durham. We find the present case distinguishable from *James M.*

{10} In *James M.*, the defendant was engaged in a heated discussion with an individual who had accused the defendant of breaking into his van. An officer happened to come upon the two during the exchange and heard the defendant yell "fuck you" to the other individual. The officer asked them to stop arguing, but the defendant, who continued to be very upset, yelled, "[f]uck you, you don't know who I am," at the other individual. *Id.* at 475, 806 P.2d at 1065. The officer testified he was concerned that a fight might erupt because the defendant was yelling, flailing his arms, pointing, and continuing to get excited, so the officer stepped between the two. Defendant was still visibly upset and he looked around the officer, pointed his finger at the other individual and again yelled, "[F]uck you. You don't know me." *Id.* At this point, the officer arrested the defendant for disorderly conduct.

{11} In upholding the conviction for disorderly conduct in *James M.*, this Court emphasized the fact that the defendant used "provocative fighting" words which were directed to a non-police officer. *Id.* at 477, 806 P.2d at 1067. We noted that "[p]olice officers, by nature of their training, are generally expected to have a higher tolerance for offensive conduct and language." *Id.; see also State v. Wade,* 100 N.M. 152, 155, 667 P.2d 459, 462 (Ct.App.1983).

{12} The State, still relying on *James M.*, argues that Defendant's conduct created the possibility that the workmen in Defendant's backyard would be incited to aid Defendant and precipitate a breach of the peace. We disagree. Although we noted in *James M.* that the incident occurred on a public sidewalk near several stores and that

four or five people had gathered to watch, our focus was on the likely breach of peace that would result from a fight between the defendant and his accuser. *See* 111 N.M. at 476, 806 P.2d at 1066 (summarizing the exchange between the principals and concluding "that it was reasonable for [the police officer] to conclude that a fight was likely to ensue").

{13} Under the facts of this case, the State's concerns about potential conduct by the workmen are simply speculation. Although there was evidence that the workmen in Defendant's backyard likely heard Defendant's statements to Officer Durham, there was no evidence that they were negatively affected by or reacted in any way to the statements. The mere fact that people may have heard Defendant's remarks, however loud or offensive they may have been, is insufficient to support a charge of disorderly conduct. There must be evidence that the remarks were likely to incite the listeners to breach the peace. *Compare B.R. v. State*, 657 So.2d 1184, 1186 (Fla.Dist.Ct.App.1995) (screaming profanities at police officer amidst crowd of onlookers not a breach of peace where "there was no evidence that [the] screaming was of such nature as to incite anyone in the area to an immediate breach of the peace") and *People v. Gentry*, 48 Ill.App.3d 900, 6 Ill.Dec. 617, 363 N.E.2d 146, 150–51 (1977) (reversing conviction for disorderly conduct despite melee that followed the defendant's arrest because the disturbance was after the arrest and involved people "obviously incensed" by the arrest), and *People v. Douglas*, 29 Ill.App.3d 738, 331 N.E.2d 359, 363 (1975) ("Vulgar language, however distasteful or offensive to one's sensibilities, does not evolve into a crime because people standing nearby stop, look, and listen.") *with Marsh v. State*, 724 So.2d 666, 666 (Fla.Dist.Ct.App.1999) (affirming conviction for disorderly conduct where evidence "established that the defendant's loud, belligerent, accusatory tirade ... was such that it excited the gathering crowd" to the point that the officers' safety became a concern). To hold otherwise would be to allow police routinely to add disorderly conduct charges to any underlying charges because it is not uncommon for those being arrested to become belligerent and for crowds to gather at the sight of an arrest.

{14} This case is also unlike *James M.* in that the statements here were directed at a police officer, rather than at a private citizen. *See* 111 N.M. at 476, 806 P.2d at 1066. In our calendar notice, we noted this Court has previously held that a police officer is not an "average person" for purposes of a city ordinance proscribing acts " 'which are inherently likely to provoke an immediate violent reaction in an average person to whom such words were addressed.' " *City of Alamogordo v. Ohlrich*, 95 N.M. 725, 726, 625 P.2d 1242, 1243 (Ct.App.1981) (quoting Alamogordo, New Mexico, city ordinance in effect at the time of the defendant's arrest). In response, the State argues against the notion that police officers are expected to have a higher tolerance for offensive language and conduct than the average person. The State argues there is no sound reason why police officers should be expected to endure more than the average citizen and suggests that "New Mexico should join the majority of other jurisdictions rejecting a special standard for police officers subjected to verbal abuse amounting to fighting words." The State cites only two cases from other jurisdictions in support of its contention that a majority of states refuse to hold police officers to a higher standard of tolerance for abusive language. Moreover, in researching this issue we found no clear majority, but rather a split in authority. *See* Michael G. Walsh, Annotation, *Insulting Words Addressed Directly to Police Officer as Breach of Peace or Disorderly Conduct*, 14 A.L.R.4th 1252 (1982).

{15} Interestingly, one of the cases the State relies on recognizes the split in authority and notes that New Mexico is among the states that holds police officers to a higher standard of tolerance for abuse or offensive language. *See State v. Beck*, 9 Kan.App.2d 459, 682 P.2d 137, 139–40 (1984). In fact, New Mexico decided this issue years ago, *see Ohlrich*, 95 N.M. at 726, 625 P.2d at 1243; *Wade*, 100 N.M. at 153, 667 P.2d at 460, and the State has not provided us with any compelling reason that persuades us to overrule existing precedent. We hold that Defen-

dant's conduct was insufficient to support a conviction for disorderly conduct. Accordingly, we reverse the conviction and remand with instructions to dismiss the charge.

*Trafficking Conviction*

{16} Our calendar notice proposed to reverse Defendant's trafficking conviction and remand for a new trial on the ground that the evidence seized pursuant to the strip search conducted after Defendant's arrest and was seized pursuant to an illegal arrest should therefore be suppressed based on the "fruit of the poisonous tree" doctrine. *See State v. Hernandez,* 1997–NMCA–006, ¶ 30, 122 N.M. 809, 932 P.2d 499. "The 'fruit of the poisonous tree' doctrine bars the admission of evidence obtained after an illegal arrest or detention except in very limited circumstances," such as where there is "a break in the causal chain leading from Defendant's unlawful arrest to the search of [his] person." *Id.* The State's only argument opposing our proposal is that Defendant's conduct did indeed amount to disorderly conduct, so the arrest was legal. Although we have determined that the evidence was not sufficient to support a conviction for disorderly conduct, we must address whether Defendant's conduct was sufficient to establish probable cause to justify his arrest for disorderly conduct.

{17} A police officer may make an arrest for a misdemeanor offense if the officer has probable cause to believe that an offense is being committed in his or her presence. *See Boone v. State,* 105 N.M. 223, 226, 731 P.2d 366, 369 (1986); *State v. Warren,* 103 N.M. 472, 475–76, 709 P.2d 194, 197–98 (Ct.App.1985). We measure probable cause by determining whether the facts and circumstances within the officer's knowledge would warrant a person of reasonable caution to believe that an offense is being committed. *See State v. Goss,* 111 N.M. 530, 534, 807 P.2d 228, 232 (Ct.App.1991). We therefore examine whether Officer Durham acted as a reasonable, cautious police officer in effecting Defendant's arrest for disorderly conduct.

{18} This Court recently reviewed the question of whether an officer had probable cause to make an arrest for the offense of disorderly conduct. *See State v. Salas,* 1999–NMCA–099, 127 N.M. 686, 986 P.2d 482. In *Salas,* the defendant and the arresting officer were both at a wedding reception. As the evening progressed, the defendant appeared to become increasingly intoxicated. Late in the evening the officer heard the defendant yelling obscenities and saw a woman standing near the defendant looking nervous and uncomfortable. The woman made eye contact with the officer, looked at the defendant, and then looked back at the officer. The officer understood this to mean that the defendant's actions were bothering the woman, so the officer approached the defendant and attempted to calm him down. This caused the defendant to become very angry; he grew louder, clenched his fists, and approached the officer. *See id.* ¶¶ 2–4. We held that the officer had probable cause to arrest the defendant because he could reasonably have concluded that the offense of disorderly conduct was occurring. *See id.* ¶ 20.

{19} As noted, there was no evidence in this case that Defendant's conduct bothered anyone other than the two officers. Moreover, unlike the situation in *Salas,* Defendant did not clench his fists or otherwise yell threats at Officer Durham. *See Swann v. City of Huntsville,* 455 So.2d 944, 950 (Ala. Crim.App.1984) (reversing the defendant's disorderly conduct conviction because his comments, "This is some shit . . . . Damn you; you're just doing this because I'm black. You're bringing us back a hundred years," did not contain a threat and were not likely to cause a violent response by the police officer to whom they were addressed, especially in view of probable training the officer received for dealing with similar situations). Instead, Defendant was protesting the officer's unauthorized search of Defendant's backyard. *See Wade,* 100 N.M. at 153, 667 P.2d at 460 (screaming obscenities and yelling "get the hell out of the house" at police did not constitute disorderly conduct); *see also State v. John W.,* 418 A.2d 1097, 1108 (Me.1980) (reversing disorderly conduct conviction and recognizing the right of an individual involved in an arrest to remonstrate, object to, or protest the arrest). Un-

der the facts of this case, we conclude that a police officer of reasonable caution would not have believed that Defendant was committing an offense. Therefore, Defendant's arrest was illegal. The State does not point to any evidence in the record showing a break in the causal chain leading from Defendant's arrest to the strip search conducted at the jail. Thus, we hold that any evidence seized pursuant to the strip search following Defendant's illegal arrest should be suppressed. *See State v. Hernandez,* 1997–NMCA–006, ¶ 30, 122 N.M. 809, 932 P.2d 499.

## CONCLUSION

{20} We reverse Defendant's disorderly conduct conviction and remand with instructions to dismiss the charge. We reverse Defendant's trafficking conviction and remand with instructions to suppress all evidence obtained pursuant to the strip search.

{21} **IT IS SO ORDERED.**

BOSSON and ARMIJO, JJ., concur.