**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

**Opinion Number: 2009-NMSC-051**

**Filing Date: September 29, 2009**

**Docket No. 31,455**

**STATE OF NEW MEXICO,**

      **Plaintiff-Appellee,**

**v.**

**DANNY CORREA,**

      **Defendant-Appellant.**

**CERTIFICATION FROM THE NEW MEXICO COURT OF APPEALS**
**Neil C. Candelaria, District Court Judge**

Hugh W. Dangler, Chief Public Defender
Adrianne R. Turner, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Gary K. King, Attorney General
Andrea Sassa, Assistant Attorney General
Santa Fe, NM

for Appellee

**OPINION**

**BOSSON, Justice.**

**{1}**    We accepted certification from the Court of Appeals to address whether the Detoxification Reform Act (DRA), NMSA 1978, §§ 43-2-1.1 to -23 (1977, as amended through 2005), prohibits criminal prosecution for breaches of the peace when the suspect's behavior amounts to the normal manifestations of intoxication. For reasons discussed more fully below, we conclude that the DRA does not preclude the State from charging an accused with disorderly conduct when the accused's conduct otherwise satisfies the statutory elements of the charge, regardless of whether the offender is intoxicated. However, because

1

the evidence in this case was insufficient to support a conviction for disorderly conduct, we reverse.

**BACKGROUND**

{2}    On September 30, 2005, at approximately 10 p.m., Albuquerque police officers Lucas Townsend and Kelly Maes responded to a call from Defendant's neighbor, Robert Root, who alleged that Defendant had made death threats against him. After interviewing Root, police walked across the street to Defendant's home and knocked on the door. When Defendant answered the door, Officer Townsend identified himself as a police officer and stated that he wanted to talk to Defendant about the incident with Root. Defendant shut and locked the metal security door and stated that he did not want to speak with the officers. Officer Townsend made a second request for Defendant's cooperation, which was refused. Officer Townsend testified that Defendant raised his voice, used profanity, and instructed the officers to leave. The officers stated that Defendant appeared to be "heavily intoxicated" based on his slurred speech, bloodshot and watery eyes, and the smell of alcohol on his breath.

{3}    At some point during this initial interaction, Defendant was joined at the front door by his friend, Marty Harrison, who also began making obscene gestures and yelling profanity at the officers through the metal security door. The officers retreated to the side of Defendant's house. As a result of Defendant's aggressive behavior, Officer Townsend was concerned for Root's safety and feared that Defendant might retaliate against Root for calling the police. The officers determined that Defendant and Harrison should not be left alone and decided to call additional officers to the scene. Approximately six officers arrived and took positions in Defendant's front driveway and in the backyard of a house adjacent to Defendant's home.

{4}    Over the next three hours, a stand-off ensued while the officers maintained their watch. During that time, Defendant came out of the house two or three times. On each occasion, he would yell at the officers and then run back inside.[1] During these incidents, Defendant would swear at the police officers, tell them to leave his property, and make statements apparently designed to entice the officers to fight. After a few hours, the officers were satisfied that Defendant and Harrison had calmed down and left the scene without arresting either man.

{5}    Nearly nine months later, Defendant was charged with one count of disorderly conduct as a result of this incident. Defendant was found guilty in the metropolitan court

---

[1]Defendant's comments allegedly included, "Hey ass hole you want some of me, f---ing punk bitch!" and "Bring it on, you want some f--- head!" and "Take off your badge!"

2

and sentenced to fifteen days in jail.[2]  Defendant appealed to the district court, and after a de novo bench trial, that court also found Defendant guilty.  Defendant appealed again to the Court of Appeals, challenging only whether the evidence was sufficient to support his conviction.  That Court *sua sponte* raised the issue before us on certification—whether the DRA removes from criminal prosecutions "breaches of the peace otherwise punishable as petty misdemeanor disorderly conduct when the suspect's behavior amounts to the normal manifestations of intoxication."

## DISCUSSION

### The Detoxification Reform Act and Disorderly Conduct

{6}     The DRA has a long history, and although it has been substantially revised over the years, its central purpose remains largely unchanged—to study the problems of alcoholism and to promote treatment and rehabilitation of alcoholics.  *See* § 43-2-5.  At issue in this case is Section 43-2-3 of the DRA, which states:

> It is the policy of this state that intoxicated and incapacitated persons may not be subjected to criminal prosecution, but rather should be afforded protection.  It is further the policy of this state that alcohol-impaired persons and drug-impaired persons should be afforded treatment in order that they may lead normal lives as productive members of society.

The Court of Appeals questions whether this section prohibits the State from prosecuting intoxicated persons for disorderly conduct pursuant to NMSA 1978, Section 30-20-1(A) (1967)[3], and we are asked to construe the relationship between these two legislative enactments.  Our research into the development of these two statutes has proved particularly helpful to understanding the effect of the modern DRA on New Mexico's current disorderly conduct statute.  Therefore, we begin with an historical perspective of these two laws.

### "Drunk and Disorderly"

{7}     From New Mexico's earliest days, drunkenness and disorderly conduct were closely intertwined, and some of the first laws on record for the Territory address drunkenness and alcoholism.  In 1855, for example, a person could be adjudged an "habitual drunkard" based on the affirmation of six men, and upon such determination, the district court could appoint a guardian or a trustee to manage both the person and his estate.  *See* 1856 N.M. Laws, ch.

---

[2]Defendant served his entire sentence prior to this appeal.

[3]Section 30-20-1(A) states that disorderly conduct consists of "engaging in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct which tends to disturb the peace."

11, §§ 1-6. In addition, the Territorial Legislature passed an Act Against Persons Who Disturb Good Order, defined as

> [e]very inhabitant within the limits of this Territory who shall appear drunk, or in their sound mind shall, within the plazas or streets, use, in loud voice, scandalous or obscene words, or may remain prostrate in the streets, or in any other public place, if they are not taken care of by some friend or relation who shall take them immediately to their houses, or prevent them from committing such scandal. Any person who shall commit such offences shall be immediately taken by any officer . . . who, if in his judgment it should be necessary, may require the aid of the citizens, to place such delinquents in the county jail, from which they shall be set at liberty, for the first offense, the following day, having to pay the usual jail fees.[4]

*Id.* § 1.

**{8}** In 1891, our Territorial Legislature prohibited "Drunkenness and Disorderly Conduct" and declared that "[i]t shall be unlawful for any person to become intoxicated or disorderly, and any person found in such state shall upon conviction thereof before a justice of the peace be fined in a sum of not less than five dollars and not more than twenty-five dollars." 1891 N.M. Laws, ch. 9, § 9. This enactment remained in force and without substantial change until 1963,[5] when the Legislature separated "disorderly conduct" from "drunkenness" as distinct offenses in the Criminal Code. *See* NMSA 1953, § 40A-20-1(A) (Vol. 6, 2d Repl.) (defining "disorderly conduct" as "violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct which tends to disturb the peace"); NMSA 1953, § 40A-20-2 (Vol. 6, 2d Repl.) ("Drunkenness consists of being so intoxicated in a public place that the person has become disorderly or is unable to care for his own safety. Whoever commits drunkenness is guilty of a petty misdemeanor."). "Drunkenness" remained a misdemeanor offense for an additional ten years when, in 1973, the Legislature repealed Section 40A-20-2 (being 1963 N.M. Laws, ch. 303, § 20-2), as part of the newly enacted Detoxification Act. *See* 1973 N.M. Laws, ch. 331, § 8.

**The Detoxification Act**

---

[4]Section 3 clarified that "[t]he foregoing sections comprise, in the same manner, women who appear in great prejudice to society, committing such scandals, having some consideration for their sex." It is not clear from the statute what this last phrase was to mean.

[5]During Prohibition from 1920 to 1933, our Legislature declared it a misdemeanor to "have, possess, or in any wise use any intoxicating liquor of any kind . . . at any dance, ball, fandango, or any public gathering, meeting or convention." 1929 N.M. Laws, ch. 37, § 9.

**{9}** In 1941, the Legislature created the Commission on Alcoholism to study the problems of alcoholism and to evaluate the methods and facilities available for treatment and rehabilitation. *See* 1949 N.M. Laws, ch. 114, § 3 (codified at NMSA 1953, § 46-12-3 (Vol. 7, Repl.)). In addition, the Legislature authorized the district courts to commit an alcoholic to an institution for up to three years if he was found to be a "habitual drunkard, chronic alcoholic, . . . any person who has been five times convicted of intoxication . . . or who is a person who has been legally determined to have lost the power of self control from the intemperate use of spirituous or intoxicating liquors." 1949 N.M. Laws, ch. 114, § 7 (codified at NMSA 1953, § 46-12-7 (Vol. 7, Repl.)).

**{10}** In 1973, the Legislature passed the Detoxification Act, which signaled a shift in the way the state addresses alcoholism. NMSA 1953, §§ 46-14-1 to -7 (Vol. 7, Repl., 1975 Pocket Supp.). Notably, the Legislature repealed Section 40A-20-2 and decriminalized "drunkenness." *See* 1973 N.M. Laws, ch. 331, § 8.[6] Rather than continuing to *punish* alcoholism, the Act authorized peace officers to transport intoxicated persons to their residences, or to a health care facility or jail—in that order, depending on the circumstances—until the intoxicated person became orderly. Section 46-14-3. The Act noted, however, that "[a]n intoxicated person held in protective custody at a jail or transported to a health care facility under the Detoxification Act shall not be considered to have been arrested or charged with any crime." Section 46-14-7(B).

**{11}** This shift continued in 1977, when the Legislature amended the Act creating the Commission on Alcoholism[7] to add a new section detailing the "policy of the State regarding alcoholism," which read:

> It is the policy of this state that alcoholics and intoxicated persons may not be subjected to criminal prosecution *because of their consumption of alcoholic beverages* but rather should be afforded a continuum of treatment in order that they may lead normal lives as productive members of society.

NMSA 1953, § 46-12-2.1 (1977) (emphasis added).

**{12}** The following year, in 1978, the Compilation Commission recompiled the New Mexico Statutes and combined the Detoxification Act, Sections 46-14-1 to -7, with the Act authorizing the Commission on Alcoholism, Sections 46-12-1 to -13, and recodified them

---

[6]The Act did not address or modify "disorderly conduct." *See* § 40A-20-1.

[7]In 1976, the Legislature abolished the Commission on Alcoholism and created in its place an Alcoholism Division Within the Hospitals and Institutions Department. We retain our shorthand name for the act for consistency when referring to the origin of NMSA 1953, §§ 46-12-1 to -13 (Vol. 7, Repl.). *See* 1976 N.M. Laws, ch. 9, § 14 (repeal Sections 46-12-1 and -2).

5

together, *see* NMSA 1978, §§ 43-2-1.1 to -23 (2005), as the DRA.

**{13}**    Notably, the Legislature amended the DRA's policy statement in 2005 and removed language that would have been helpful to resolving the present dispute.  Rather than stating that a person "may not be subjected to criminal prosecution *because of the consumption of alcohol*," the policy statement now reads:

> It is the policy of this state that *intoxicated and incapacitated persons may not be subjected to criminal prosecution*, but rather should be afforded protection.  It is further the policy of this state that alcohol-impaired persons and drug-impaired persons should be afforded treatment in order that they may lead normal lives as productive members of society.

NMSA 1978, § 43-2-3 (2005).

**{14}**    Under the pre-2005 version of the Act, it was clear that the Legislature intended to eliminate criminal prosecution for the *act* of consuming alcohol, and to prohibit statutes where drunkenness is an element of the offense.[8]  The Act is less clear following the 2005 amendment, largely due to the Legislature's substituted statement that "intoxicated and incapacitated persons may not be subjected to criminal prosecution."  Taken literally, this language would suggest that a person could not be criminally prosecuted for *any* offense—including murder—if the accused happened to be intoxicated at the time of the crime.  However, this language must be viewed in the context of the overarching amendments to the policy statement.

**{15}**    The 2005 amendment broadened the scope of the DRA to include substance abuse as well as alcoholism.  In conjunction with this change, it was necessary to remove the language "because of the consumption of alcohol" from the policy statement, although the Legislature could have modified the language to make clearer its intent.[9]  Accordingly, it

---

[8]Driving while intoxicated is specifically exempted from the Act.  *See* NMSA 1978, § 43-2-4(C) (1989) ("Nothing in this section affects any law, ordinance, resolution or rule against driving under the influence of alcohol or drugs or other similar offense involving the operation of a vehicle, aircraft, boat, machinery or other equipment or regarding the sale, purchase, dispensing, possessing or use of alcoholic beverages at stated times and places or by a particular class of persons.").

[9]Interestingly, in 1989, the Legislature created a curious two-year window that permitted criminal prosecution for the consumption of alcohol.  The Legislature amended the policy statement to read:  "It is the policy of this state that alcoholics and intoxicated persons *may* be subjected to criminal prosecution *because of their consumption of alcoholic beverages* only under circumstances of chronic public intoxication and, whenever possible, should be afforded a continuum of treatment . . . . "  NMSA 1978, § 43-2-3 (1989) (emphasis added); *see* 1989 N.M. Laws, ch. 378, § 1 (Vols. 6-9, 1989 Repl. Pamp.).  However, this

appears that the change in the policy statement indicates the Legislature's intent to address a broader category of "substance abuse" through the DRA, rather than limiting it to intoxication. Nothing else in the amended DRA suggests an intent to make a radical change in existing criminal law.

**{16}**  An expansive interpretation of the statement "intoxicated and incapacitated persons may not be subjected to criminal prosecution" would contravene longstanding New Mexico law. For example, a literal interpretation would mean that an accused would not be criminally liable for murder, burglary, assault, or battery if he was intoxicated when he committed the offense. However, our courts and our Legislature have never suggested that voluntary intoxication could provide wholesale immunity to the accused, or preclude the State from pursuing criminal sanctions. *See, e.g.*, *State v. Nozie*, 2009-NMSC-018, ¶ 41, 146 N.M. 142, 207 P.3d 1119 (stating that intoxication may be raised as an affirmative defense to negate specific intent). Such a position would have far-reaching implications and would dramatically alter the Criminal Code in New Mexico. We find no indication that the Legislature intended to do so by way of textual changes to a mere policy statement defining the purpose of the DRA.

**{17}**  The narrower issue before us is to determine whether the Legislature, through the DRA, intended to "preclude the handling of drunkenness under any of a wide variety of petty criminal offense statutes, such as loitering, vagrancy, disturbing the peace, and so forth." Unif. Alcoholism and Intoxication Treatment Act, 9 U.L.A. 229, 230 (1999). The historical relationship between drunkenness and disorderly conduct suggests that in earlier years the Legislature specifically intended to punish disorderly conduct resulting from intoxication. However, as the State's policy on alcoholism evolved, so too did the relationship between disorderly conduct and drunkenness. When the Legislature classified "disorderly conduct" and "drunkenness" as separate offenses in 1963, it signaled an end to the century-old relationship between the two offenses, perhaps in recognition that a person may behave in a disorderly manner without consuming alcohol and conversely that just because a person is intoxicated—even in a public place—does not make him disorderly.

**{18}**  It is significant that the Legislature repealed only "drunkenness" when it enacted the Detoxification Act in 1973, and did not modify the disorderly conduct statute. When the Legislature stated that "alcoholics and intoxicated persons may not be subjected to criminal prosecution *because of their consumption of alcoholic beverages*," it made clear that citizens should not be criminally punished solely for being intoxicated. Section 43-2-3 (emphasis added). Therefore, peaceful public drunkenness could not be criminally punished, either as

---

change was enacted with a sunset clause and automatically reverted back to the previous language used in the 1977 policy statement—prohibiting criminal prosecution because of the consumption of alcohol—two years later in 1991. *See* NMSA 1978, § 43-2-3 (1989, repealed effective July 1, 1991); 1989 N.M. Laws, ch. 378, § 2 (Vols. 6-9, 1989 Repl. Pamp.).

drunkenness or any other petty misdemeanor, including disorderly conduct.

**{19}** However, the DRA does not purport to prohibit punishment for conduct that is otherwise criminal or otherwise qualifies as disorderly conduct merely because the offender may be intoxicated. While intoxication itself is not criminal, any criminal offenses committed while an accused is intoxicated are still punishable under the Criminal Code. The DRA does not indicate that intoxication can ever be a mitigating factor, an affirmative defense, or a ground for dismissal when a defendant's conduct is also disorderly within the meaning of Section 30-20-1(A). Therefore, we conclude that the DRA does not remove disorderly conduct from criminal prosecution merely because an accused is intoxicated, as long as the statutory elements of the charge are satisfied. An accused's intoxication cannot alone form the basis for the charge; the elements of disorderly conduct must all be proven. Accordingly, because we perceive no conflict between the DRA and the Criminal Code, we proceed to evaluate Defendant's challenge to his conviction for disorderly conduct.

**Sufficiency of the Evidence**

**{20}** Defendant challenges the sufficiency of the evidence to support his conviction for disorderly conduct.

> Substantial evidence review requires analysis of whether direct or circumstantial substantial evidence exists and supports a verdict of guilt beyond a reasonable doubt with respect to every element essential for conviction. We determine whether a rational factfinder could have found that each element of the crime was established beyond a reasonable doubt.

*State v. Kent*, 2006-NMCA-134, ¶ 10, 140 N.M. 606, 145 P.3d 86 (citations omitted). "The reviewing court does not weigh the evidence or substitute its judgment for that of the fact finder as long as there is sufficient evidence to support the verdict." *State v. Mora*, 1997-NMSC-060, ¶ 27, 124 N.M. 346, 950 P.2d 789.

**{21}** Disorderly conduct is a petty misdemeanor, and occurs when an accused engages in "violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct which tends to disturb the peace." Section 30-20-1. "This statutory provision has two elements: the conduct itself and the tendency of the conduct to disturb the peace." *State v. Salas*, 1999-NMCA-099, ¶ 12, 127 N.M. 686, 986 P.2d 482. Both must be present. There is no question that Defendant's conduct satisfies the first element: his conduct reasonably could be seen as abusive, indecent, profane, boisterous, or unreasonably loud. The question for us to determine is whether that conduct could also be seen as tending to disturb the peace.

**{22}** Our Legislature has not defined what it means to "disturb the peace." Our courts have stated that "the standard is whether defendant's conduct *tends* to disturb the public peace." *State v. James M.*, 111 N.M. 473, 476, 806 P.2d 1063, 1066 (Ct. App. 1990). "Conduct which tends to disturb the peace is that conduct 'which is inconsistent with the

8

peaceable and orderly conduct of society.'" *Id.* (quoting *State v. Oden*, 82 N.M. 563, 565, 484 P.2d 1273, 1275 (Ct. App. 1971)). We have defined "disturbing the peace" as "'a disturbance of public order by an act of violence, or by any act likely to produce violence, or which, by causing consternation and alarm, disturbs the peace and quiet of the community.'" *State v. Florstedt*, 77 N.M. 47, 49, 419 P.2d 248, 249 (1966) (quoting *People v. Most*, 64 N.E. 175, 177 (N.Y. 1902)). We have construed the statute narrowly and, "[u]nless the acts complained of fall clearly within the statute, they are not disorderly." *Id.*

**{23}** The State argues that Defendant disturbed the peace in two ways: (1) by his use of "fighting words" directed toward the police officers, and (2) by inciting his companion, Harrison, to breach the peace. As we discuss in more detail below, the evidence at trial was insufficient to support Defendant's conviction on either ground.

## Defendant's Conduct Toward the Police

**{24}** The State argues that Defendant disturbed the peace by verbally attacking the police officers. The State posits that Defendant's provocative remarks amounted to fighting words, which "by their very utterance inflict injury or *tend to incite an immediate breach of the peace*.'" *James M.*, 111 N.M. at 476, 806 P.2d at 1066 (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942)) (emphasis added). "Fighting words" are measured by their likelihood of provoking an average person to react violently, although it is not necessary that the person who is insulted actually react. *Id.*

**{25}** Our courts have upheld disorderly conduct convictions based on the use of provocative fighting words addressed to a non-police officer. *See id.* at 477, 806 P.2d at 1067 (upholding the defendant's disorderly conduct conviction where the defendant was arguing with a third party, yelling provocative fighting words, and appeared to be ready to fight). However, our Court of Appeals has previously held that police officers are not "average persons" when considering the likelihood of provocation, because "'[p]olice officers, by the nature of their training, are generally expected to have a higher tolerance for offensive conduct and language.'" *State v. Hawkins*, 1999-NMCA-126, ¶ 11, 128 N.M. 245, 991 P.2d 989 (quoting *James M.*, 111 N.M. at 477, 806 P.2d at 1067). We follow this settled precedent in deciding the present dispute.

**{26}** It is undisputed that Defendant yelled vulgar and profane statements at the police over the course of three hours. However, our Court of Appeals has previously considered similar conduct, and held that "[s]creaming obscenities and yelling 'get the hell out of the house' do not amount to 'fighting' words, particularly when they are addressed to police officers, who are supposed to exercise restraint." *State v. Wade*, 100 N.M. 152, 155, 667 P.2d 459, 462 (Ct. App. 1983) (citation omitted) (reversing the defendant's conviction for abusing a policeman pursuant to NMSA 1978, Section 30-22-1(D) (1981), when the defendant screamed obscenities at police, who entered the defendant's home in response to a domestic violence call by his wife); *see also Hawkins*, 1999-NMCA-126, ¶¶ 4, 15 (reversing the defendant's disorderly conduct conviction for yelling at the police, "This isn't

a f---ing crack house" and "Get out of my f---ing yard," because "New Mexico is among the states that holds police officers to a higher standard of tolerance for abuse or offensive language."). "Usually, arguing with a police officer, even when using profane and insulting words, will not be enough to constitute disorderly conduct, unless the words are coupled with threatening behavior." 12 Am. Jur. 2d *Breach of Peace and Disorderly Conduct* § 32 (2009) (internal citations omitted); *see also Salas*, 1999-NMCA-099, ¶¶ 20, 37 (upholding the defendant's conviction for disorderly conduct where he spoke loudly, used profanity, and clenched his fists as he walked toward an officer); *Hawkins*, 1999-NMCA-126, ¶ 19 (distinguishing *Salas* because the defendant "did not clench his fists or otherwise yell threats" at the officer).

**{27}** In the present case, the record does not reveal any threatening conduct accompanying Defendant's verbal insults toward the police. During the initial encounter, Defendant closed and locked a metal screen door to separate himself from the officers and to bar access to the inside of his home. The State did not present any evidence indicating that Defendant or Harrison moved to open the locked metal door or attempted to physically confront the officers. After this brief, thirty-second initial encounter, the record indicates that the officers had only two or three short interactions with Defendant over the next three hours. The officers testified that Defendant came out of the house to yell at the officers, but would advance only as far as the porch before quickly retreating inside to avoid arrest. Defendant's conduct, while cowardly and surely irritating, posed no threat to the officers present at the scene.

**{28}** The State did not argue or otherwise present evidence that Defendant's conduct posed any actual threat of violence to the officers. Officer Maes testified that the officers "thought we were going to be threatened, there was a possibility to be harmed."[10] However, in a similar case, the Court of Appeals reasoned that an officer's perception that a suspect *might* become combative was insufficient to support a disorderly conduct conviction. *State v. Doe*, 92 N.M. 100, 102, 583 P.2d 464, 466 (1978) (reversing the defendant's disorderly conduct conviction where he argued with police officers during traffic stop but was not combative and "no act of violence was attempted").

**{29}** It is also significant that Defendant's taunting, even though his words may have been threatening, occurred at a distance. The amount of provocation created by Defendant's words might have been greater if Defendant were closer to the officers. In this case, Defendant refused to leave his porch, indicating that he feared or sought to avoid actual

---

[10]Although Officer Maes testified that he perceived Harrison's size as a threat, he did not indicate that Harrison made threatening gestures or otherwise acted violently. Moreover, even if Harrison had threatened violence, that conduct cannot be attributed to Defendant as evidence that Defendant disturbed the peace, unless Harrison's conduct was incited by Defendant—a position we dispel below.

confrontation with the officers. Indeed, Officer Townsend testified that the officers were waiting for Defendant to come outside so that they could place him under arrest for disorderly conduct. If Defendant had advanced beyond his porch or physically threatened the officers, they would have seized upon the opportunity to arrest him.

{30}    We are not indifferent to the officers in this case. Their valuable role in confronting situations of conflict often carries with it the unfortunate consequence of verbal abuse. The officers in this situation exercised admirable restraint in the face of Defendant's "rude, obnoxious, and . . . vulgar speech." However, it is because of their degree of skill, training, and experience that we rely on officers not to react to verbal provocation, at the risk of escalating a situation rife with conflict. Accordingly, without evidence of anything more than profane and vulgar remarks, the evidence is insufficient to support Defendant's conviction based on what he said to the officers. As our Court of Appeals noted in *Hawkins*, "New Mexico decided this issue years ago, and the State has not provided us with any compelling reason that persuades us to overrule existing precedent." 1999-NMCA-126, ¶ 15 (citation omitted).

## Disturbing the Tranquility of the Community and Incitement

{31}    As we indicated above, the Legislature has not provided guidance on what it means to "disturb the peace." In 1966, when we drew an analogy between "disturbing the peace" and "breach of the peace" in *Florsted*, we identified three categories of conduct that may satisfy the second element of disorderly conduct:  (1) an actual act of violence; (2) an act likely to incite another to violence; and (3) an act that disturbs the peace and tranquility of the community. 77 N.M. at 49, 419 P.2d at 249 (disturbing the peace is "a disturbance of public order by an act of violence, or by any act likely to produce violence, or which, by causing consternation and alarm disturbs the peace and quiet of the community" (quoting *Most*, 64 N.E. at 177)). In the 43 years following that decision, this Court has never had occasion to consider a case where an accused's conduct was alleged to have disturbed the tranquility of the community. Although the State theoretically could have made such an argument here, considering the time, place, and manner of Defendant's conduct, it did not do so in its briefing. On appeal, issues not briefed are considered abandoned, and we do not raise them on our own.[11] *State v. Gee*, 2004-NMCA-042, ¶ 25, 135 N.M. 408, 89 P.3d 80.

{32}    At trial, the State noted that Defendant's yelling was loud enough that it attracted his neighbors. However, the State never argued, as an independent basis for Defendant's conviction, that his yelling amounted to unreasonably loud noise which disturbed the tranquility of the neighborhood. Rather, the State focused on how Defendant's behavior impacted the officers and Harrison. On appeal, the State claims that the three-hour duration

---

[11]The State had a full opportunity before the Court of Appeals to explain the evidence and its theory for conviction. The briefing to this Court was confined to the issue certified to us pertaining the DRA.

of the incident caused "the *police* to fear for their personal safety and for the safety of Mr. Root and the neighbors living adjacent to Defendant." Because the State does not advocate that Defendant's behavior tended to disturb or incite his neighbors—a conclusion not apparent from the record—we do not consider further the impact of Defendant's behavior on the surrounding community in our review.

**{33}** However, the State did argue, both to the trial court and on appeal, that Defendant's behavior incited Harrison to breach the peace. *See Hawkins*, 1999-NMCA-126, ¶¶ 12-13. We rely on *Hawkins*, a factually similar case, where the Court of Appeals discussed disorderly conduct by incitement.

**{34}** In *Hawkins*, two police officers entered Hawkins's property in pursuit of a criminal suspect. After the officers apprehended the suspect, one reentered Hawkins's backyard to search for evidence. Hawkins followed and confronted the officer, yelling, "This isn't a f---ing crack house" and "Get out of my f---ing yard." *Id.* ¶ 4. These statements were overheard by workers installing a pool in Hawkins's backyard. The officers arrested Hawkins for disorderly conduct and, on Hawkins's appeal of his conviction, the State argued that "Defendant's conduct created the possibility that the workmen in [Hawkins's] backyard would be incited to aid [Hawkins] and precipitate a breach of the peace." *Id.* ¶ 12. The Court of Appeals held that

> there was no evidence that [the workers] were negatively affected by or reacted in any way to the statements. *The mere fact that people may have heard Defendant's remarks, however loud or offensive they may have been, is insufficient to support a charge of disorderly conduct. There must be evidence that the remarks were likely to incite the listeners to breach the peace*.

*Id.* ¶ 13 (emphasis added). The State argues that the present case is similar to *Hawkins*, but that, unlike the workers in *Hawkins*, there *is* evidence that Harrison actually reacted to Defendant's statements by "mimicking" his behavior. We are not persuaded.

**{35}** The evidence establishes that Harrison joined Defendant at the front door during Defendant's initial contact with the police officers and Harrison, like Defendant, shouted aggressive and profane statements to the officers. At trial, Officer Townsend testified that,

> during the initial contact, [Defendant] was calm but maybe within one sentence later he elevated his voice, profanities, very upset over the fact that police were there at the house. And I *guess* the tall, Native American later identified as Marty Harrison, began to mimic that same behavior screaming, using profanity as well.

(Emphasis added.) Officer Townsend's opinion is the only statement in the record to suggest that Harrison "mimicked" Defendant, and the trial court relied on this statement as evidence

that Defendant incited Harrison. However, Officer Townsend's "guess" is merely speculation and fails to establish a causal connection between Defendant's conduct and Harrison's.

**{36}** Harrison testified at trial and was asked on cross-examination:

[Prosecutor:] Did [Defendant] yelling and being so upset have any effect on you?
[Harrison:] No, sir, not at all.
[Prosecutor:] So you didn't have any reaction to him being --
[Harrison:] No.
[Prosecutor:] Do you think you still would have been angry if he had been perfectly calm?
[Harrison:] Yes . . . .

**{37}** Moreover, as we discussed above, shouting profanity at police officers, without more, does not itself amount to a breach of the peace—no different for Harrison than for Defendant. We can find no evidence to show a causal connection that Harrison was influenced by or reacted as a consequence of Defendant's behavior. This evidence is insufficient to establish that Defendant incited Harrison to breach the peace.

**CONCLUSION**

**{38}** We reverse the disorderly conviction of Defendant.

**{39} IT IS SO ORDERED.**

_____
**RICHARD C. BOSSON, Justice**

**WE CONCUR:**

_____
**EDWARD L. CHÁVEZ, Chief Justice**

_____
**PATRICIO M. SERNA, Justice**

_____
**PETRA JIMENEZ MAES, Justice**

_____
**CHARLES W. DANIELS, Justice**