**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 10, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

ROWENA TACHIAS; MONIQUE
DERETA,

     Plaintiffs - Appellees,

v.

DANA SANDERS, in her individual
capacity,

     Defendant - Appellant,

and

LOS LUNAS SCHOOLS BOARD OF
EDUCATION,

     Defendant.

No. 22-2139

_____

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 1:21-CV-00085-MIS-JFR)**

_____

Carlos M. Quiñones, Quiñones Law Firm LLC, Santa Fe, New Mexico, for Defendant-Appellant.

Matthew M. Beck (Leon Howard III, American Civil Liberties Union of New Mexico Foundation, with him on the brief), Peifer, Hanson, Mullins & Baker, P.A., Albuquerque, New Mexico, for the Plaintiff-Appellees.

_____

Before **MATHESON**, **BACHARACH**, and **EID**, Circuit Judges.

_____

**EID**, Circuit Judge.

_____

Appellant Dana Sanders was the Superintendent of the Los Lunas, New Mexico Public Schools when Rowena Tachias and Monique Dereta ("the Appellees") created a Facebook page titled the "Los Lunas School District Parent Discussion Page" and used it to publicly discuss school-related matters online. Sometime after the page's creation, Sanders learned of the page and felt that it was problematic for the school district. Sanders then undertook a series of actions, including investigating the page, discussing it with numerous people, filing a trademark for the name of the school district, and eventually issuing "cease and desist" letters demanding that the Appellees delete the page. The cease-and-desist letters—which threatened future litigation if the Appellees did not comply—alarmed the Appellees, who felt that their First Amendment rights were being stifled.

The Appellees decided to sue Sanders and the Los Lunas School Board under 42 U.S.C. § 1983, alleging that Sanders violated their First Amendment rights by threatening frivolous legal action against them in retaliation for their speech. Sanders alone, in her individual capacity, asserted qualified immunity against this First Amendment retaliation claim and moved for summary judgment. The district court denied Sanders's motion and held that she was not entitled to qualified immunity. This interlocutory appeal followed.

Reviewing de novo, we agree with the district court that Sanders is not entitled to qualified immunity on the Appellees' § 1983 claim. To defeat Sanders's claim of

2

qualified immunity, the Appellees had to show, from the undisputed facts, two things: (1) that Sanders's conduct violated the Appellees' constitutional rights, and (2) that the constitutional right was "clearly established" at the time of Sanders's conduct.

The district court determined both that a constitutional violation occurred and that the violation was clearly established under existing Tenth Circuit precedent at the time of Sanders's conduct. In so concluding, the district court reasoned that Sanders's threatened lawsuit was retaliatory, speech-chilling, and legally frivolous, such that it violated the Appellees' First Amendment rights.

We first hold that, due to inadequate briefing on appeal, Sanders has waived any challenge to the denial of qualified immunity based on the first prong—that a constitutional violation occurred. On the second prong, we hold that the facts in this case are "materially similar" to those in a prior opinion of this Circuit, *Beedle v. Wilson*, 422 F.3d 1059 (10th Cir. 2005), and therefore Sanders's actions violated clearly established law. Specifically, we hold that it was clearly established at the time of Sanders's conduct that government actors violate the First Amendment when they threaten frivolous legal actions in retaliation for a person's constitutionally protected speech. We therefore affirm the district court's denial of Sanders's motion for summary judgment.

## I.

In February 2011, the Appellees created a non-commercial Facebook page titled the "Los Lunas School District Parent Discussion Page." ROA at 10. As the

3

administrators of that page, they had editorial control over what content appeared on it. Discussing Los Lunas public schools was of personal interest to the Appellees because, at that time, they both had children or grandchildren enrolled in the schools. The page's content came entirely from either the Appellees' own posts or user-submitted posts that the Appellees approved for publication. All administrator-approved posts, regardless of authorship, could then be commented on by page members.

Sanders eventually became aware of the page around the summer of 2018—more than seven years after the Appellees created it. The page initially came to her attention because "parents and community members complained about" it. *Id.* at 11. These complaints generally suggested that the page was causing confusion among members of the public about various matters related to the Los Lunas public schools, such as "snow day" information. Also of concern to at least some parents and community members was the fact that certain posts on the page criticized specific, identifiable people. For example, one post cast the principal of Valencia Middle School, a Los Lunas public school, in a poor light.

Soon after Sanders learned about the Facebook page, she began applying for a trademark for the phrase "Los Lunas Schools." She believed that a trademark would help her control the use of the name of the Los Lunas Public Schools. Around that same time, Sanders expressed her concern about the content of the Facebook page to members of the School Board. She texted Board members that, in her view, the page's content was "totally out of control." *Id.* at 13. Sanders also told the Board

that she had asked the school district's attorney to investigate the matter because, at the very least, she wanted certain content (such as the post maligning the Valencia Middle School principal) removed from the Facebook page.  Finally, Sanders notified the Board that she had begun the process of applying for the trademark.

Sanders kept following the Facebook page throughout October 2018 and offered regular updates to the Board about it.  In one such update, Sanders included special text in a unique font that described the Facebook page as "THE HATERS PAGE," which Sanders claimed was a name that "many have labeled it."  *Id.* at 14. Sanders's concern with the content on the page continued.  For example, she pointed out to the Board that the page included posts referencing a protest that occurred at an in-district football game and may have also included posts referencing a School Board meeting.

Sanders formally filed the trademark application on October 22, 2018, and the trademark was granted on July 9, 2019.  The trademark includes the phrase "Los Lunas Public Schools," but not the phrase "Los Lunas School District."

Sanders informed the School Board in early August 2019 that she had asked the school district's attorney to write cease-and-desist letters referencing the new trademark and deliver one to each of the Appellees.  She indicated her expectation that this action would cause "a disturbance" and "an uproar" on the Facebook page. *Id.* at 15, 17.  The cease-and-desist letters were then sent on August 29, 2019, to the Appellees—or, as Sanders called them, the "operators" of the "Haters page."  *Id.* at 17.  The letters stated that the school district would "take further legal action

5

including filing of a civil lawsuit" if the Appellees failed to comply. *Id.* at 16.

Additionally, the letters included a form for the Appellees to sign, assuring that they

would comply in exchange for being "release[d] . . . from any claims of

infringement." *Id.* at 16–17.

The Appellees received the letters and immediately changed the page name to

"Parent Discussion Page of Local Public Schools." *Id.* at 17. About a month later,

however, the Appellees reverted to the original page name. Thereafter, the school

district issued a media statement asserting that the page was negatively affecting the

"orderly operations of individual schools and the district." *Id.*

In October 2019, an attorney representing Sanders and the school district sent

another letter to the Appellees, demanding that they remove the phrase "Los Lunas

Schools" from the Facebook page. As with the August letters, this letter stated that

the Appellees' "[f]ailure to comply will cause the District to seek and enforce its

legal remedies available under the Trademark including damages." *Id.* at 18. The

Appellees then sought legal counsel for guidance on whether the new trademark

required them to remove "Los Lunas Schools" from their page's name.

The Appellees ultimately decided to sue Sanders and the Los Lunas School

Board in February 2021, bringing a claim for First Amendment retaliation under 42

U.S.C. § 1983. Sanders alone, in her personal capacity, moved for summary

judgment, asserting qualified immunity. The district court denied Sanders's motion,

holding that she was not entitled to qualified immunity because her conduct violated

the Appellees' First Amendment free speech rights and because, at the time of her

6

conduct, Sanders's constitutional violation was clearly established as such under Tenth Circuit precedent.

In its reasoning, the district court found that Sanders's acquisition of the trademark and her subsequent cease-and-desist letters were substantially motivated by a desire to retaliate against the Appellees for their constitutionally protected speech. The district court also found that Sanders's cease-and-desist letters would chill an ordinary person's speech—and that the letters in fact actually chilled the Appellees' speech. Finally, the district court concluded that Sanders's threatened trademark-infringement suit was legally baseless because the Appellees did not use the trademarked school-district name in a commercial context—which, the district court noted, is a requirement for trademark infringement claims. Thus, the district court held that Sanders violated the First Amendment by threatening frivolous litigation against the Appellees in retaliation for their posts on the Facebook page.

Sanders timely appealed from the denial of her motion for summary judgment, and the district court stayed the case pending the outcome of this appeal.

## II.

"[W]e review the district court's denial of a summary judgment motion asserting qualified immunity de novo." *Fancher v. Barrientos*, 723 F.3d 1191, 1199 (10th Cir. 2013) (citing *Dodds v. Richardson*, 614 F.3d 1185, 1192 (10th Cir. 2010)).

But we can only review such a denial if we have jurisdiction. We have jurisdiction to review "all final decisions of the district courts of the United States." 28 U.S.C. § 1291. Ordinarily, orders denying summary judgment are "not appealable

final [decisions] for purposes of . . . § 1291." *Sawyers v. Norton*, 962 F.3d 1270, 1281 (10th Cir. 2020) (quoting *Roosevelt-Hennix v. Prickett*, 717 F.3d 751, 753 (10th Cir. 2013)) (internal quotation marks omitted). "The denial of qualified immunity to a public official, however, is immediately appealable under the collateral order doctrine to the extent it involves abstract issues of law." *Id.* (quoting *Fancher*, 723 F.3d at 1198) (internal quotation marks omitted). Abstract issues of law concern "(1) whether the facts that the district court ruled a reasonable jury could find would suffice to show a legal violation" and "(2) whether that law was clearly established at the time of the alleged violation." *Roosevelt-Hennix*, 717 F.3d at 753.

There is one important caveat to our review. At the point of interlocutory appeal, "we are not at liberty to review a district court's factual conclusions, such as the existence of a genuine issue of material fact for a jury to decide, or that a plaintiff's evidence is sufficient to support a particular factual inference." *Fogarty v. Gallegos*, 523 F.3d 1147, 1154 (10th Cir. 2008). Appellate jurisdiction based on the collateral-order doctrine is limited to the questions of law necessary to determine the interlocutory issue; thus, we lack jurisdiction to consider factual arguments or challenges to the sufficiency of the evidence supporting any factual inference. *Id.*; *see Medina v. Cram*, 252 F.3d 1124, 1130 (10th Cir. 2001). Instead, we generally must accept the district court's factual findings and its conclusions that a reasonable jury could find any particular facts. *Sawyers*, 962 F.3d at 1281.[1]

---

[1] There are three exceptions to this principle, but none apply here. *See McWilliams v. DiNapoli*, 40 F.4th 1118, 1122 (10th Cir. 2022) (noting that appellate

We turn now to the substantive standard for qualified immunity. When a defendant asserts qualified immunity at the summary judgment stage, "the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right, and (2) the constitutional right was clearly established." *Kapinski v. City of Albuquerque*, 964 F.3d 900, 905 (10th Cir. 2020) (quoting *Koch v. City of Del City*, 660 F.3d 1228, 1238 (10th Cir. 2011)) (internal quotation marks omitted). Therefore, our qualified immunity analysis here requires that we consider both whether the Appellees have shown that Sanders violated their First Amendment rights and whether that "constitutional violation [was] clearly established at the time" of Sanders's conduct. *McWilliams v. DiNapoli*, 40 F.4th 1118, 1124 (10th Cir. 2022). And we may "exercise [our] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).[2] In this particular case, we first consider the "constitutional violation" prong.

---

courts may "revisit the district court's factual determinations" in an interlocutory appeal if (1) "the district court failed to identify the factual disputes," (2) "the record blatantly contradicts the court's factual determinations," or (3) "the district court committed legal error en route to the factual determinations" (cleaned up)).

[2] Although courts may consider the two prongs of qualified immunity in any order, "under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014). This is especially so where "a court decides only the clearly-established prong," because that prong requires courts to "define the clearly established right at issue on the basis of the specific context of the case." *Id.* (internal quotation marks and citation omitted).

*A. Qualified Immunity's "Constitutional Violation" Prong*

The district court determined that the Appellees satisfied the "constitutional violation" prong by showing that Sanders's conduct violated their First Amendment rights to free speech. *See* ROA at 22–33. More specifically, the district court held that Sanders violated the First Amendment by threatening frivolous litigation against the Appellees in retaliation for their posts on the Facebook page. *Id.*

And while Sanders, in her opening brief on appeal, makes a few generalized statements about the "constitutional violation" prong, we hold that she failed to adequately brief this issue and therefore has waived any argument as to this prong.

We reach this conclusion after considering several things. First, Sanders does not mention qualified immunity's "constitutional violation" prong in her statement of the issues in her opening brief. Sanders also does not address it in her summary of the argument. Nor does she propose any standard of review to guide us in reviewing the district court's factual findings that led it to conclude that Sanders did in fact violate the Appellees' First Amendment rights. And although Sanders mentions the prong when setting out the general legal standard for qualified immunity, she provides no meaningful analysis of it whatsoever, focusing instead only on challenges to the district court's factual findings (and to the sufficiency of the evidence for any factual inferences)[3] before abruptly turning to the second prong.

---

[3] For example, at one point in her opening brief, Sanders argues that "[t]here was nothing presented . . . that Defendant-Appellant was substantially motivated by Plaintiffs-Appellees' speech in the body of their Facebook site—she instead was concerned with the use of the school district's name in the site's title causing

"[A]n appellant may waive an issue by inadequately briefing it." *Burke v. Regalado*, 935 F.3d 960, 1014 (10th Cir. 2019). After all, "[t]he rules of appellate procedure are designed to facilitate efficient appellate review by allowing one's adversary to respond to focused argument supported by authority." *MacArthur v. San Juan County*, 495 F.3d 1157, 1160 (10th Cir. 2007). Specifically, Federal Rule of Appellate Procedure 28(a)(8)(A) "requires the argument section to contain appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies." *Id.* (internal quotation marks omitted). "Cursory statements, without supporting analysis and case law," are insufficient to preserve an issue. *Bronson v. Swensen*, 500 F.3d 1099, 1105 (10th Cir. 2007).

---

disruption" to the school district. Aplt. Br. at 16–17. In the same vein, Sanders also contends that evidence of retaliatory motive "is sorely lacking where, as here, Defendant-Appellant's conduct in obtaining the trademark and sending the cease-and-desist letter was aimed at use of the school district's name and not the content of Plaintiffs-Appellees' speech." *Id.* at 17.

All of this suggests that Sanders disagrees with the district court's determination that the evidence was sufficient for a reasonable jury to find that her actions were "substantially motivated as a response to the [Appellees'] exercise of constitutionally protected conduct." ROA at 30–33. But, as explained, we lack jurisdiction to review the district court's factual findings—or its conclusions with respect to evidence sufficiency—in this interlocutory appeal. *Sawyers*, 962 F.3d at 1281; *Fogarty*, 523 F.3d at 1154. Indeed, "even when a defendant 'attempts to characterize the issue on appeal as [the plaintiff's] failure to assert a violation of a constitutional right under clearly established law,' we will decline to consider the argument if it is 'limited to a discussion of [the defendant's] version of the facts and the inferences that can be drawn therefrom.'" *Duda v. Elder*, 7 F.4th 899, 909–10 (10th Cir. 2021) (quoting *Castillo v. Day*, 790 F.3d 1013, 1018 (10th Cir. 2015)) (alterations in original). Inadequate briefing aside, then, the fact that Sanders casts any possible first-prong argument as a factual challenge precludes us from considering it.

Therefore, to the extent Sanders intended to argue that the Appellees failed to show a constitutional violation under the first prong of qualified immunity, we "decline[] to consider" that argument because it was "not raised, or [was] inadequately presented, in [Sanders's] opening brief." *Id.* at 1104; *cf. Duda v. Elder*, 7 F.4th 899, 916–17 (10th Cir. 2021) (holding on interlocutory appeal that official had waived "any jurisdictionally appropriate challenge" to the district court's holding on the second prong of qualified immunity because the official had "not made one" (citing *Sawyers*, 962 F.3d at 1286)). We thus hold that Sanders has waived her opportunity to challenge the district court's conclusion that her actions violated the Appellees' First Amendment rights, and we leave that conclusion undisturbed.[4]

## B. Qualified Immunity's "Clearly Established" Prong

Accepting the district court's unchallenged conclusion that Sanders's actions constituted a violation of the Appellees' First Amendment rights (*see* ROA at 33), we now turn to the "clearly established" prong of qualified immunity. Under this prong, past cases must closely fit the facts of the present case for us to determine that Sanders's conduct, at the time, violated clearly established law.

In considering this prong, we must not "abstract [our past] holdings to the situation here" too much. *Est. of Smart v. City of Wichita*, 951 F.3d 1161, 1174 (10th

---

[4] We note, at this juncture, that it is procedurally proper for appellate courts to leave in place a district court's ruling on either prong of qualified immunity when a party fails to preserve the issue. *See Sawyers*, 962 F.3d at 1286 (letting stand the denial of summary judgment on first prong of qualified immunity where appellant only raised factual challenges and deeming a challenge to the second prong waived where appellant failed to adequately brief the issue).

Cir. 2020). Doing so may "define[] the qualified immunity inquiry at [too high a] level of generality." *Mullenix v. Luna*, 577 U.S. 7, 16 (2015) (per curiam). Although there need not be a "case directly on point," *id.* at 12, "the clearly established law must be 'particularized' to the facts of the case." *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). In short, "[t]he salient question is whether the state of the law at the time of an incident provided fair warning to the defendants that their alleged conduct was unconstitutional." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (cleaned up).

The district court concluded that Sanders's conduct was, at the time it occurred, clearly established as a violation of the Appellees' First Amendment rights based on a "materially similar" published precedent of this Court. Specifically, the district court concluded that existing cases have clearly established that a government actor violates the First Amendment when they threaten frivolous litigation in retaliation for a person's exercise of their right to free speech.

"[A] 'materially similar' published case from the Supreme Court or Tenth Circuit may give an official fair notice that their specific conduct would violate a constitutional right." ROA at 33 (citing *Apodaca v. Raemisch*, 864 F.3d 1071, 1076 (10th Cir. 2017)). In determining that Sanders was not entitled to qualified immunity, the district court found our previous case *Beedle v. Wilson*, 422 F.3d 1059 (10th Cir. 2005), to be materially similar to the facts of this case. We agree that the facts in *Beedle* are materially similar enough to those in this case to have put Sanders on notice that her conduct violated the Appellees' First Amendment rights.

13

In *Beedle*, we held that a frivolous lawsuit brought by the government in retaliation for an individual's speech critical of the government violated the First Amendment. 422 F.3d at 1069–71. In that case, plaintiff Peggy Lee Korn was allegedly a victim of sexual battery committed by a nurse's aide while Korn was hospitalized at a public hospital. *Id.* at 1063. Korn and her husband, Larry E. Beedle, wrote two public letters that asked if anyone else had experienced such treatment while at that hospital, and they mailed these letters to local residents in the hospital's vicinity. *Id.* The hospital then sued Beedle for libel on account of the letters. *Id.* Beedle and Korn responded by filing suit in federal court, alleging that the hospital violated Beedle's First Amendment rights "by filing the malicious and wrongful state-court libel lawsuit against him." *Id.* at 1063–64. Beedle contended that the hospital's suit was intended both to intimidate and punish him for the exercise of his free-speech rights against the hospital and to chill his future speech. *Id.* at 1064. He also argued that, as a government entity, the hospital was precluded from filing a malicious libel claim against a private citizen. *Id.*

We considered two cases in *Beedle* that involved criminal prosecutions: *Wolford v. Lasater*, 78 F.3d 484 (10th Cir. 1996), and *Gehl Group v. Koby*, 63 F.3d 1528 (10th Cir. 1995). Those cases, we determined, "make clear that a governmental lawsuit brought with the intent to retaliate against a citizen for the exercise of his First Amendment rights is itself a violation of the First Amendment and provides grounds for a § 1983 suit." *Beedle*, 422 F.3d at 1066. Important to our holding, we agreed with Beedle that government entities like a public hospital may not bring libel

14

actions against private citizens—making the hospital's suit legally baseless. *Id.* at 1066–67. Thus, we held that the hospital's frivolous, retaliatory lawsuit violated Beedle's First Amendment rights. *Id.* at 1067. *Beedle* therefore created a clearly established rule in the Tenth Circuit: government actors violate the First Amendment when they initiate frivolous legal action against a person in retaliation for that person's exercise of their rights to free speech, including speech critical of the government.

Compare *Beedle* to the facts of the present case. Here, the Appellees' Facebook page was used as a means of spreading criticisms and concerns regarding government employees—namely, employees of Los Lunas public schools. The Facebook page thus functioned much like the letters critical of the hospital that Beedle mailed to local residents: both publicly disseminated disapproving messages about government employees. Furthermore, Sanders, like the hospital in *Beedle*, "was substantially motivated to threaten litigation against [the Appellees] in response to th[eir] protected speech" that she objected to. ROA at 36. Because the facts in *Beedle* closely fit those in the case before us, Sanders's conduct would seem to fall squarely within that clearly established precedent.

Nevertheless, Sanders tries to distinguish *Beedle*. She argues that her threatened trademark infringement lawsuit is different from the malicious libel lawsuit in *Beedle* because the hospital there was precluded, as a matter of law, from filing that type of action. By contrast, Sanders claims, "[i]t goes without saying" that

15

she would have "the capacity to file suit for trademark infringement."  Aplt. Br. at

21.

True, *Beedle* relied in large part on the fact that the public hospital was barred

(under "ample [legal] authority") from bringing a malicious libel action against

Beedle, a private citizen.  422 F.3d at 1071.  But what made that fact important was

that it showed that the hospital's lawsuit was legally frivolous—which, in turn, was

evidence that the lawsuit was retaliatory.  *See id.* at 1067.

The same is true of Sanders's threatened lawsuit.  Despite Sanders's

perfunctory assertion that she would have "the capacity" to bring a trademark

infringement action against the Appellees, such an action would be legally baseless.

Indeed, the district court expressly concluded that Sanders's "threatened lawsuit

fail[ed] to set forth a legally viable claim" and was therefore "frivolous."  ROA at

36–38.  In so concluding, the district court noted that, as a legal matter, the Lanham

Act only applies when an alleged infringer uses another's trademark commercially, or

"in connection with goods or services"—which was not the case here, given that the

Appellees' use of the Los Lunas Public Schools name was decidedly non-

commercial.  *See id.* at 28–29 (citing *Utah Lighthouse Ministry v. Found. for

Apologetic Info. & Rsch.*, 527 F.3d 1045, 1051–52 (10th Cir. 2008)).

We agree with the district court.[5]  Because the Appellees used the trademarked

Los Lunas Public Schools name solely in connection with their "critical commentary

---

[5] Notably, although Sanders briefly states that she would be entitled to bring a trademark infringement action against the Appellees, she does not meaningfully

about the trademark owner," and because their "use of the trademark was separated from any goods or services," the Lanham Act does not apply. *Utah Lighthouse*, 527 F.3d at 1052. We therefore hold that Sanders's threatened lawsuit was frivolous, like the hospital's lawsuit in *Beedle*. Once again, then, her conduct seems to fall within the case's ambit. But there remains the fact that, in *Beedle*, the hospital actually commenced litigation against Beedle—whereas here Sanders only ever *threatened* litigation against the Appellees. That, however, turns out to be a distinction without a difference.

Sanders suggests otherwise. She contends that her "sending the cease-and-desist letter was aimed at use of the school district's name and not the content of Plaintiff-Appellees' speech." Aplt. Br. at 17. And so—as Sanders sees it—her threat of litigation served only as a cautionary measure, aiming to prevent further "disruption" from the Facebook page. *See id.* at 25–26. In other words, Sanders contends that the cease-and-desist letter could not chill the Appellees' speech because all it did was notify the Appellees that their speech was disruptive and in violation of the newly minted trademark she had acquired for the school district.

---

challenge the district court's conclusion to the contrary. She supplies no cases casting doubt on the authorities cited by the district court, nor does she otherwise explain how she would be entitled to bring a trademark infringement claim notwithstanding the Appellees' non-commercial use of the mark. Without any supporting analysis or legal authority, Sanders's argument regarding the frivolousness of her threatened trademark infringement lawsuit is inadequately briefed, and we would ordinarily deem it waived. *See Burke*, 935 F.3d at 1014. But because "we understand enough about [Sanders's] argument[] to conclude that [it is] meritless," we exercise our discretion to address her point. *MacArthur*, 495 F.3d at 1161.

And because the letter was only *threatening* litigation over the trademark, Sanders's logic goes, her conduct could not violate the First Amendment, even under *Beedle*.

But the Supreme Court has rejected an analogous theory before. In *Bantam Books, Inc. v. Sullivan*, the Supreme Court held that even the mere threat of retaliatory litigation can unconstitutionally chill speech. 372 U.S. 58, 64 (1963). That case dealt with a Rhode Island state commission whose duty was to seek out any form of speech that, in the commission's view, "contain[ed] obscene, indecent, or impure language," and also to "educate the public concerning" said speech. *Id.* at 59. As part of its duties, the commission was required "to investigate and recommend the prosecution of all violations" of speech-decency statutes under state law. *Id.* at 60.

Meanwhile, the appellants in *Bantam Books* were four book publishers who, according to the commission, were distributing obscene content. The distributor for all four publishers had received notices from the commission, which stated that some of the publishers' books were "objectionable" and suggested that the commission could recommend prosecution against the publishers. *Id.* at 62. In response to the notices, the distributor took "steps to stop further circulation" of the named books—refusing to fill pending orders, refusing new orders, and returning all unsold copies to the publishers. *Id.* at 63. Those facts, the Supreme Court held, demonstrated "a scheme of governmental censorship" that violated the First Amendment. *Id.* at 64.

Similarly, the Appellees in this case were, in Sanders's view, violating the "Los Lunas Public Schools" trademark and causing substantial disruption with their Facebook-page speech. Sanders found that speech objectionable, and she notified the

18

Appellees by sending them the cease-and-desist letters. And in response to those notices, the Appellees—like the distributor in *Bantam Books*—took steps to stop their objectionable speech by changing (even if temporarily) the name of their Facebook page. Thus, Sanders's conduct amounted to a form of governmental censorship similar to that in *Bantam Books*.

The fact that Sanders never took legal action against the Appellees does not change this conclusion. After all, the *Bantam Books* appellants' publications were never "seized or banned by the State," and "no one ha[d] been prosecuted for their possession or sale" at the time of the case; all the commission could do was "exhort[] booksellers and advise[] them of their legal rights." *Id.* at 66–67. But the Supreme Court nevertheless held that the absence of any actual legal sanctions did not change the fact that the commission's very existence, and its process of investigating and recommending prosecution of obscene content, chilled the appellants' speech. *Id.* at 67. The Court reasoned that even "the *threat* of invoking legal sanctions and other means of coercion, persuasion, and intimidation" alone showed that "the Commission deliberately set about to achieve the suppression of publications deemed 'objectionable' and succeeded in its aim." *Id.* (emphasis added).

So too here. The district court found "ample evidence that [Sanders] was substantially motivated to seek legal action against [the Appellees] in response to protected speech occurring on the page," ROA at 32, which indicates Sanders deliberately sought to suppress the Appellees' speech. Further, sending the cease-and-desist letters, even without initiating formal legal action, was itself enough to

19

chill a person of ordinary firmness from continuing to speak—not least because the letters included forms for the Appellees to sign and return within ten days, assuring their compliance with Sanders's demands.  And, again, the fact that the Appellees at one point changed the name of the Facebook page in response to the cease-and-desist letters is yet further evidence that Sanders's actions in fact had a chilling effect on the Appellees' speech.[6]

This chilling effect leads us to conclude that there is no material difference between a *threatened* civil action (as is present in this case, and as was present in *Bantam Books*) and an *actually filed* civil action (as was present in *Beedle*).  Taken together, *Beedle* and *Bantam Books* clearly establish that a government actor threatening frivolous litigation in retaliation for a person's constitutionally protected speech violates the First Amendment.[7]  Thus, we hold that the fact that Sanders

---

[6] Sanders does not challenge the district court's conclusion that the evidence was sufficient for a reasonable factfinder to find that her cease-and-desist letters had a chilling effect.  Of course, we would lack jurisdiction to consider any such factual or sufficiency-of-the-evidence arguments, as explained above.  *See Fogarty*, 523 F.3d at 1154.  In any event, we see no reason to disagree with the district court's conclusion.

[7] Our holding is limited to government threats of *frivolous* retaliatory litigation.  As explained, the district court correctly concluded that Sanders's threatened suit was indeed frivolous.

We thus do not have occasion to decide whether the threat of a *meritorious-*yet-retaliatory lawsuit violates clearly established law in our Circuit.  But we pause to note that the Supreme Court has at least suggested that, even with "proof of some retaliatory animus," a lawsuit threatened by the government may not necessarily run afoul of the First Amendment if there is some other legitimate, non-retaliatory basis on which it could have, and would have, still been brought.  *Nieves v. Bartlett*, 587 U.S. 391, 398–401 (2019); *see Hartman v. Moore*, 547 U.S. 250, 259–60, 264–65 (2006); *cf. Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 743 (1983) ("The filing and prosecution of a well-founded lawsuit may not be enjoined . . . , even if it

threatened a baseless civil lawsuit against the Appellees is materially similar to the fact that the public hospital in *Beedle* filed a baseless civil lawsuit against Beedle.[8] Because Sanders's constitutional violation was clearly established by the existence of a materially similar case among our precedent, we hold that the district court correctly denied Sanders's motion for summary judgment because she is not entitled to qualified immunity on the Appellees' § 1983 First Amendment retaliation claim.

## III.

For the foregoing reasons, we AFFIRM.

---

would not have been commenced but for the plaintiff's desire to retaliate against the defendant for exercising [protected] rights.").

[8] Additionally, the record before us indicates that the only reason that Sanders has not yet actually filed a civil action against the Appellees is that she previously represented that she would not seek enforcement of the trademark against the Appellees while this case is pending. *See* ROA at 37. In light of the district court's finding that Sanders's cease-and-desist letter was speech-chilling, we conclude that her letter threatening suit is materially similar to the actual speech-chilling suit filed in *Beedle*.